388 So.2d 309 (1980)
Robert P. McTEAGUE, Appellant,
v.
Lewis D. TREIBITS, Appellee.
No. 79-942.
District Court of Appeal of Florida, Fourth District.
September 17, 1980.
*310 James R. Hustad of Hustad & Kurtz, West Palm Beach, for appellant.
Sidney A. Stubbs, Jr. of Jones, Paine & Foster, West Palm Beach, for appellee.
GLICKSTEIN, Judge.
Robert P. McTeague wished to construct a warehouse on a parcel of land he owned in Delray Beach, Florida. Not being able to finance the project, he placed an advertisement in the newspaper for prospective investors. Lewis D. Treibits responded to the advertisement. They formed a corporation, Tea-Tree, Inc., and each received 500 shares of the capital stock. They also executed a Shareholders' Agreement, which provided a right of first refusal in the corporation in the event that either wished to sell his stock, and if the corporation declined, then the other shareholder had the right to accept the selling shareholder's offer.[1]
*311 Paragraph 6 of the Shareholders' Agreement states:
6. Purchase Price. The Shareholder desiring to sell his stock (seller) shall, after complying with the notice provisions of paragraph 4, be deemed to have granted the CORPORATION or the other shareholder (buyer) the right to set the price and terms for the stock of the shareholder desiring to sell (seller). Upon the CORPORATION or the shareholder (buyer) having received written notice of the offer to sell, it or he shall, at the meeting called for in paragraph 4(a) disclose the price and terms of the stock of the shareholder desiring to sell (seller) that he (buyer) has set. The shareholder desiring to sell (seller) shall then have the absolute right to purchase the shares of stock held by the other shareholder (buyer) at the price and terms set by the other shareholder (buyer). The shareholder desiring to sell (seller) must either accept or decline his right to purchase the other shareholder's (buyer) stock at the price and terms he (buyer) has established at that meeting. If he declines, then the shareholder desiring to sell (seller) shall be bound to sell his shares to the other shareholder (buyer) at the terms and price he (buyer) established.
Mr. Treibits testified at the trial about paragraph 6:
Did I understand the terms of it? That one paragraph was confusing to me. I had to read it over and over again until I understood what it meant and the intent was there.
So did Mr. McTeague:
The thing that I remember is that I wanted to understand just what it said, and after going over it two or three or four times, I forget which, I finally got it through my head that this is what we really wanted, both of us, so that is what was incorporated into the shareholders' agreement.
On May 11, 1978, Mr. Treibits wrote to Tea-Tree, Inc., and Mr. McTeague that he wanted to sell his 500 shares of stock in the corporation. Mr. McTeague in a responsive letter on behalf of the corporation wrote to Mr. Treibits that the shareholders' meeting would be held on May 17, 1978, at the warehouse.
Also at that time the shareholders disputed a separate matter-the amount owed by the corporation to Robert Page Construction Company. The last mentioned company had built the warehouse for Tea-Tree, Inc., and was owned by Mr. McTeague. While Mr. Treibits conceded something was owed, he believed the amount was substantially less than that thought by Mr. McTeague.
Present at the shareholders meeting on May 17th were the two shareholders, an attorney representing Mr. Treibits and a court reporter. The transcript of the meeting reflects that Mr. McTeague presented a document on behalf of the corporation entitled "Condition of Sale," which provided:
1. The sale price for 500 shares of Tea Tree Inc. to be $60,000.00 less advance of $12,000.00.
TERMS
$10,000.00 cash at Closing; a second mortgage of $38,000.00 at 9 1/2% for eight years; First principal payment due two years from date of Closing; interest payments to be paid quarterly commencing ninety days from the date of Closing. The Closing date to be within ten days after receipt of final construction payment from First Bank of Delray Beach or not longer than sixty days from date of acceptance of the condition of sale.
2. Full payment to Robert Page Construction Inc. for work done in accordance with his agreement in the amount of $28,738.00 plus 15% of all unpaid bills and work in progress from May 17, 1978 to Closing date.
3. Return of Sellers Construction security (if any) held by First Bank of Delray Beach.

*312 4. Seller to assist in every way to obtain final Construction payment from First Bank of Delray Beach.
Mr. Treibits contended paragraphs 2, 3 and 4 of the Condition of Sale had nothing to do with paragraph 6 of the Shareholders' Agreement. Mr. McTeague replied that they did. The meeting ended on the following note:
MR. TREIBITS: I have exercised my rights to purchase your shares of stock for $48 thousand[[2]] under the terms in paragraph one that you submitted to me and I dispute paragraph two and three being included in the Condition of Sale because it is not called for in the Shareholder's Agreement.
MR. McTEAGUE: Let it be noted that Mr. Treibits has not complied with the full Conditions of Sale and therefore we will conclude this meeting, if there is no other business.
MR. TREIBITS: All right, I agree that we should conclude the meeting.
On May 30, 1978, the attorney present at the shareholders' meeting wrote Mr. McTeague's attorney, who was not present, saying:
... At the meeting Dave Treibits offered to purchase Bob McTeague's stock after declining to sell to Bob. The problem was that Bob added some extraneous terms to the agreement which had nothing to do with the Stockholder's Buy and Sell Agreement. Thus, Dave has now agreed to buy Bob's stock for $10,000.00 in cash plus a second mortgage of $38,000.00... .
On June 5, 1978, Mr. McTeague's attorney wrote back:
In accordance with your client's position as enumerated in your letters, please find enclosed the stock certificate owned by Robert McTeague in Tea-Tree, properly endorsed on the reverse side for transfer of his stock interest therein to Dave Treibits. Please advise when the closing date can be firmly established within the perimeter set forth at the meeting of the shareholders, i.e., within ten (10) days after closing on the construction mortgage, final draw, or sixty (60) days from date of the meeting at which the offer was made.
Mr. McTeague testified at the trial on January 18, 1979, that this transmittal of his stock certificate was without authority.
The attorney for Mr. Treibits delivered the stock certificate to his client on July 14, 1978, and transmitted a check for $10,000, together with an executed note and mortgage for $38,000, to Mr. McTeague's attorney. Upon receipt thereof, the latter returned them and requested that the stock certificate be retrieved from Mr. Treibits. At his attorney's request, Mr. Treibits delivered the stock certificate to his attorney where it remained until the trial of this cause. Mr. McTeague brought this action to recover his stock certificate on September 6, 1978. Following a non-jury trial, the trial court entered a final judgment on February 27, 1979, in favor of Mr. Treibits and made the following findings:
1. The original Shareholder's Agreement between Plaintiff and Defendant dated November 21, 1977, establishes a procedure for the parties to utilize in the event that either party wishes to sell his stock. This procedure was initiated by Defendant TREIBITS and the procedure to establish a meeting was followed.
2. At the meeting for the sale of stock on May 17, 1978, Plaintiff McTEAGUE presented a document entitled, "Conditions of Sale." Paragraph No. 1 of the "Conditions of Sale" contained "Price and Terms" in accordance with paragraph 6 of the Shareholder's Agreement. Paragraphs 2, 3, and 4 of the "Conditions of Sale" were extraneous conditions not within the definition of "Price and Terms" of Paragraph 6 of the Shareholder's Agreement. Therefore, Paragraph 2, 3, and 4 were a nullity.
3. Defendant TREIBITS had an absolute right under Paragraph 6 of the *313 Shareholder's Agreement to exercise his option to either buy McTEAGUE's stock or sell his stock. He exercised his option to buy McTEAGUE's stock. He complied with the "Price and Terms" by presenting a check for $10,000 and a mortgage for the balance of $38,000 to his attorney, James W. Nowlin, Jr.
4. There was no unauthorized settlement by Defendant McTEAGUE's lawyer since there was no settlement involved, but merely the carrying out of the terms of paragraph 6 of the Shareholder's Agreement upon Defendant TREIBITS' exercise of his option to buy McTEAGUE's stock.
Certain preliminary matters must be considered. First, both parties testified that they studied paragraph 6 of the Shareholder's Agreement and understood it. We conclude they had reached a binding agreement. In Blackhawk Heating and Plumbing Co., Inc. v. Data Lease Financial Corp., 302 So.2d 404, 408-9 (Fla. 1974), the supreme court said:
Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them. A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto. 17 C.J.S. Contracts § 31.
* * * * * *
As Professor Corbin stated in his treatise, Corbin on Contracts, Vol. 1 (1963), § 97, at 424:
"If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract."
The contract should not be held void for uncertainty unless there is no other way out. As was stated by Justice Cardozo in Heyman Cohen & Sons, Inc. v. M. Lurie Wollen Co., Inc., 232 N.Y. 112, 133 N.E. 370, 371, "Indefiniteness must reach the point where construction becomes futile."
Second, Mr. Treibits had an absolute right under paragraph 6 to buy Mr. McTeague's stock even though there was uncertainty as to the meaning of the word "terms" in that paragraph. In Blackhawk Heating and Plumbing, Co., Inc. v. Data Lease Financial Corp., supra at 409, the court continued:
Again turning to Professor Corbin, he states at § 95, page 400:
"If the parties have concluded a transaction in which it appears they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left."
* * * * * *
... Where a dispute exists as to the amount of money to be paid on the exercise of an option, such a dispute does not vitiate an otherwise perfectly valid exercise of the option... .
The real issues sub judice are (1) what meaning should have been given to the word "terms" in paragraph 6 of the Shareholders' Agreement, and (2) what action should the trial court have taken once having interpreted that word. As for the first issue, implicit in the trial court's final judgment was its interpretation of "terms" in a restrictive sense similar to that given by the supreme court in Murphy v. Green, 102 Fla. 102, 135 So. 531 (1931). In that case the court held:
The words "terms and conditions" in the sale of property usually have a definite meaning; namely, the amount, time and manner of payments.
Id., at 102 Fla. 106, 135 So. 533.
It was also the position taken by Mr. Treibits at the shareholders' meeting. We believe this to be a reasonable interpretation of the word as it appeared in paragraph 6 *314 of the parties' agreement. We also adhere to the general rule that on appeal the construction placed upon a contract by a trial court should be affirmed unless clearly erroneous. Clark v. Clark, 79 So.2d 426 (Fla. 1955); Bornstein v. Somerson, 341 So.2d 1043 (Fla.2d DCA 1977), cert. denied 348 So.2d 944 (Fla. 1977); Rylander v. Sears Roebuck & Co., 302 So.2d 478 (Fla.3d DCA 1974).
Having concurred with the trial court in its interpretation of the word "terms," we now turn our attention to what action should be taken with respect to Mr. McTeague's stock. We note that Mr. McTeague testified as follows:
A. When I determined the sales price of the stock, I had to consider the liabilities of the corporation that, to me, would determine the value of the corporation. Now, if the price of $60,000 were coupled with what Tea-Tree owed Robert Page, that would constitute a true value for the corporation.
Q. Doesn't that, in fact, settle the controversy between Tea-Tree, Inc. and Robert Page Construction Company, Inc.?
A. It would have.
Q. Which is now-it wasn't then-but is now, the subject matter of other litigation which is going on right now?
A. It would have, yes.
The abovementioned "other litigation" refers to Robert Page Construction Company's then pending claim against Tea-Tree, Inc., for the amount owed to the former for its construction of the latter's warehouse. If Robert Page Construction Company prevails in that action, Mr. McTeague, as its owner, in essence will satisfy his claim sub judice that the true value of his stock in Tea-Tree, Inc. is $60,000 plus the amount owed to Robert Page. In light of the other concurrent action we believe that the trial court was correct in not ordering the return of the stock. Accordingly, we affirm the final judgment.
AFFIRMED.
ANSTEAD and MOORE, JJ. concur.
NOTES
[1] Paragraph 4 of the Agreement was the applicable paragraph and provided:

4. Offer to Sell to Corporation and Shareholder. No shareholder shall sell, assign, or otherwise transfer any of his shares in the CORPORATION to any person, firm, entity or corporation, unless the shareholder desiring to make such transfer (hereinafter referred to as the "Transferor") shall have first made a written offer to sell all of his shares to the CORPORATION and other shareholder and such offer shall not have been accepted by either.
a. Within thirty (30) days after the receipt of such written offer, a meeting of the shareholders shall be called by the CORPORATION upon not less than ten (10) days, nor more than fifteen (15) days, notice by registered or certified mail, and such meeting shall be held at the then principal place of business of the CORPORATION during normal business hours. At such meeting, all the shares of the Transferor shall be offered for sale to the CORPORATION, and the CORPORATION may accept the Transferor's offer, at the time of such meeting. The purchase or redemption by the CORPORATION shall be at the price as set forth in paragraph 6. If the CORPORATION accepts the Transferor's offer to purchase or redeem the Transferor's stock, the sale shall close not more than sixty (60) days after the date of acceptance of the offer by the CORPORATION.
b. If all of the shares of the Transferor are not purchased or redeemed by the CORPORATION in accordance with the provisions of sub-paragraph (a) above, then the other shareholder may accept such offer, individually, and in that event, such other shareholder shall accept or reject the offer made by the Transferor within thirty (30) days of such shareholder meeting called by the CORPORATION. The purchase price shall be as set forth in paragraph 6 and the time of closing shall be within sixty (60) days of the acceptance of the offer by the individual shareholder.
c. If all of the shares of the Transferor are not purchased or redeemed by the Corporation or shareholder in accordance with the provisions of subparagraphs (a) and (b) above, then, the Transferor may transfer his shares to any person, firm, entity or corporation, except that he shall not sell any such shares without first giving the CORPORATION and the other shareholder the right to purchase them at the price and on the terms offered by such other person, firm, entity or corporation.
[2] The figure of $48,000 used by Mr. Treibits represented the net figure in paragraph 1 of the Condition of Sale; to-wit, $60,000 less an advance of $12,000.