Argued and submitted January 19, affirmed on appeal and on cross-appeal
May 4, 1994

Brett WILCOX,
*Respondent - Cross-Appellant,*

*v.*

Steven F. STILES,
*Appellant - Cross-Respondent,*
*and*

CAPITAL REALTY CORP.,
an Oregon corporation,
*Respondent.*

Steven F. STILES,
*Counterclaim, Third-Party Claim and*
*Cross-Claim Plaintiff - Appellant -*
*Cross-Respondent,*

*v.*

Brett WILCOX,
*Counterclaim Defendant - Respondent -*
*Cross-Appellant,*

Mary WILCOX,
*Third-Party Defendant - Respondent,*
*and*

CAPITAL REALTY CORPORATION,
*Cross-Claim Defendant.*

CAPITAL REALTY CORP.,
*Cross-Claim Plaintiff,*

*v.*

Steven F. STILES,
*Cross-Claim Defendant.*

(9103-01479; CA A74530)

873 P2d 1102

William F. Gary argued the cause for appellant - cross-respondent. With him on the briefs were Harrang, Long, Watkinson, Laird & Rubenstein, James E. Mountain, Jr. and Milo R. Mecham.

Barnes H. Ellis argued the cause for respondent - cross-appellant Brett Wilcox and respondent Mary Wilcox. With him on the briefs were Katherine A. McDowell and Mary K. VanderWeele.

Michael H. Simon, Karl I. Mullen and Perkins Coie waived appearance for respondent Capital Realty Corp.

Before Deits, Presiding Judge, and Richardson, Chief Judge, and Riggs, Judge.

RIGGS, J.

## RIGGS, J.

Defendant, Steven Stiles, a shareholder in a closely-held corporation, seeks reversal of a judgment declaring that he was obligated to vote to dissolve the corporation and a judgment of specific performance ordering him to tender his shares. He also seeks a remand for entry of a judgment awarding him relief for breach of fiduciary duty and for a jury trial on his claim for breach of contract. Plaintiff, Brett Wilson, cross-appeals the denial of his claim for breach of contract. We affirm on the appeal and on cross-appeal.

The parties formed Capital Realty Corporation (CRC) to develop a shopping center and other projects. According to the pre-incorporation agreement, plaintiff was responsible for arranging for or providing capital. Defendant was obligated to devote his time and expertise to the venture. Both parties were responsible for the debts of CRC; however, plaintiff had much heavier personal financial exposure because he backed CRC debt with substantial collateral. The pre-incorporation agreement also provided for the adoption of a plan of "liquidation" and the sale of corporate assets in certain circumstances of disagreement between the parties.

On formation of the corporation, each party received 100 shares in CRC and became a director of the corporation. Following incorporation and due to concerns that the two-member board might deadlock, the parties drafted a share-holder agreement, which provided that

> "[i]f the directors are deadlocked in the management of the corporate affairs and the Shareholders are unable to break the deadlock * * *, the Shareholders shall immediately call a special meeting of the Shareholders and vote all of the Shares so as to cause the dissolution of the Corporation and the distribution of its assets to the shareholders."

The agreement also provided that a vote to dissolve the corporation would trigger a buy/sell provision under which one shareholder could offer to buy the other's shares. The offer to buy had to contain an offer to sell on the same terms.

After purchasing land and starting to develop a shopping mall, the parties had a falling out. Their disagreement began at a December, 1990, meeting where plaintiff suggested that both parties contribute $250,000 in capital to

cover the first year's losses, which totalled $522,000. Defendant refused to contribute,[1] and, instead, asked for incentive compensation of $220,000 in addition to his base salary of $180,000. Plaintiff did not agree with defendant's position that he deserved the incentive pay and that defendant should not be asked to contribute $250,000 to help cover the loss.

Disagreement between the parties erupted again at a February, 1991 meeting, when defendant objected to a two percent financing fee that plaintiff collected whenever he lent money to CRC or arranged for a bank to loan CRC funds. Defendant asserted that the two percent fee applied only to loans that plaintiff made and not to the loans that plaintiff personally arranged. By the time of the February meeting, plaintiff had made or personally secured $12,000,000 in loans to CRC. Defendant invested $10,000.

The parties' working relationship was finally destroyed in a February 13, 1991, meeting in which defendant proposed that his salary be raised to $240,000 with a 10 percent per year escalator, that the parties eliminate the two percent fee, and that his capital contribution be limited to $10,000. On February 18, 1991, plaintiff called a meeting to invoke the dissolution-upon-deadlock provisions of the shareholder agreement. However, defendant refused to attend any of the board meetings that plaintiff called. Defendant apparently refused to attend meetings for the purpose of stalling or preventing a vote on dissolution.

Plaintiff filed suit and moved for a preliminary injunction compelling defendant to attend a shareholder meeting. At the hearing on the motion, defendant resigned as an officer and director of CRC and asserted that his resignation ended the deadlock. The trial court denied the preliminary injunction.

With defendant's consent, plaintiff's wife replaced defendant on CRC's board of directors. Plaintiff and his wife voted to issue plaintiff an additional 125 shares in exchange for forgiveness of the $250,000 loan he made to cover the

---

[1] In his deposition, defendant testified that "I told him I couldn't afford to [make the loan] so I didn't." At trial, defendant testified "I think I could have afforded it, to tell you the truth."

1990 losses. Plaintiff voted his shares to dissolve the corporation. The board then adopted a plan of dissolution. Even though defendant was a 30 percent stockholder after the new shares were issued, the plan of dissolution treated defendant as a 50 percent shareholder, not subject to a minority discount for his shares. Under the plan of dissolution, defendant could elect dissenter's rights and have his shares valued under court supervision.

Defendant moved for a preliminary injunction voiding the 125 new shares issued to plaintiff and enjoining plaintiff from voting the shares in favor of dissolution. The trial court denied the injunction. On June 13, 1991, the shareholders met and plaintiff voted his shares in favor of a plan of dissolution and liquidation. Defendant protested the vote and declined to exercise dissenter's rights. Plaintiff then presented defendant with an offer to buy his shares for $200,000 and a release from all guarantees and loans made to CRC. Plaintiff's offer cited a term of the shareholder agreement under which failure to respond to an offer to buy within one month would be deemed an acceptance. Pursuant to the shareholder agreement, plaintiff offered to sell defendant his shares in the company on the same terms. Defendant did not respond to plaintiff's offer by the closing date of July 19, 1991.

Plaintiff brought this action seeking a declaration that defendant was deemed to have accepted plaintiff's offer, specific performance of the buy/sell provision of the shareholder agreement and damages for breach of contract. He alleged that defendant's breach of the shareholder agreement resulted in CRC obtaining less favorable terms on a loan. Defendant counterclaimed for breach of contract, oppression by a majority shareholder and breach of fiduciary duty.

The case was tried to the court, which ruled:

"Based upon the evidence and arguments presented, the court finds that plaintiff Brett Wilcox has established his claims for declaratory judgment and specific performance, but failed to establish his claim for incidental damages based upon breach of contract. The court further finds that defendant Steven F. Stiles has not proven his counterclaims against plaintiff Brett Wilcox for breach of fiduciary duty, breach of contract and majority shareholder oppression * * *. The court also finds that defendant Stiles has not established

his second claim against defendant Capital Realty Corp. for dissolution."

The court made these oral findings:

"1. That defendant acted in bad faith.

"2. That plaintiff's decision to issue additional shares was made in good faith.

"3. That defendant's actions clouded the title of the corporation's property, affecting the corporation's ability to act on its behalf."

The trial court made no specific credibility findings, but it did say that "all of the evidence, all of it, preponderates in the plaintiff's favor."

■ Defendant assigns error to the declaration that plaintiff's buy/sell offer was properly tendered and binding on defendant and to the order that he specifically perform the shareholder agreement by tendering his shares. We review the findings and judgment in an action involving corporate duties *de novo*. *See Chiles v. Robertson*, 94 Or App 604, 619, 767 P2d 903, *mod* 96 Or App 658, 774 P2d 500, *rev den* 308 Or 592 (1989).

■ Defendant claims that there was no management deadlock to force him to vote for dissolution, thus the dissolution-upon-deadlock provision was not activated. That provision reads:

"If the directors are deadlocked in the management of the corporate affairs and the shareholders are unable to break the deadlock * * * the Shareholders *shall* immediately call a special meeting of the shareholders and vote all of the shares so as to cause the dissolution and liquidation of the corporation." (Emphasis supplied.)

Defendant first argues that parties' dispute did not involve management issues. We disagree. The parties disputed whether they should make capital contributions, how defendant should be paid for his time and whether plaintiff should be compensated for arranging and securing loans. In the context of a corporation with two 50/50 shareholders, these questions of investment capital and compensation were management issues.

██ Defendant next argues that there was no deadlock. Deadlock is the inaction which results when two equally powerful factions stake out opposing positions and refuse to budge.[2] Defendant asserts that, because CRC bought, sold and leased property during the parties' disagreement, there was no deadlock.[3] The fact that there was some business as usual does not negate deadlock. Only by negotiating through their lawyers could the parties sell and lease property, thus avoiding CRC's collapse. The parties' inability to convene a shareholder's meeting to resolve their differences is persuasive evidence of deadlock.[4] We conclude that the parties were deadlocked.

█ Because the parties were deadlocked on management issues, plaintiff was entitled to invoke the buy/sell provision of the shareholder agreement. The next issue is whether a requirement in plaintiff's buy/sell offer — that the buyer obtain a release of the seller's loan guarantees — conflicts with the shareholder agreement. That agreement provides:

> "If a shareholder shall have guaranteed any of the obligations of the corporation and shall sell his shares in accordance with this Agreement, the Corporation and the other shareholder shall thereafter hold the selling shareholder free and harmless of and from any liability on each guaranty executed by the selling Shareholder on behalf of the Corporation."

Defendant argues that plaintiff's requirement that the seller obtain a release from lenders of all loan guarantees is inconsistent with the provision that the selling shareholder should be held "free and harmless" by the purchasing shareholder.

---

[2] Oregon case law concerning deadlock does not define the term. The term is not defined in ORS 60.661, which lists deadlock as a ground for judicial dissolution. All uses of the word of which we are aware are consistent with the dictionary definition of the term as "a stoppage produced by counter-action." *See* Howe, *Corporate Divorce: Deadlocks in the Close Corporation*, 22 Bus Law 469 (1967) (discussing the parent statute of ORS 60.661).

[3] Defendant does not cite to any portion of the record that shows that the parties bought property after their disagreements surfaced.

[4] Defendant argues that there could be no management deadlock because the shareholders never met. However, the reason the board never met was that defendant refused to attend the meetings.

We do not see the conflict. Nothing in the shareholder agreement suggests that the hold harmless agreement was the *only* form of protection from CRC's liability that the seller could get.

We disagree with defendant's contention that conditioning a sale on a release from loan guarantees is fundamentally unfair because it would be difficult for defendant, the sweat equity partner, to find another money partner who could guarantee the loans and obtain a release of plaintiff's guarantees. It would be even less fair to permit defendant to obtain full control of CRC while leaving plaintiff exposed to a $12,000,000 loss if CRC defaulted on its loans.

Defendant next argues that it was unfair to require the buyer to obtain the release of the seller's loan guarantees within a 33-day period. The fairness of the time limit is moot because defendant testified that he had no intention of finding a money partner.

■    Defendant also argues that the price offered for the shares was unfair. He cites *Chiles v. Robertson, supra,* for the proposition that, when majority shareholders propose to purchase the minority's shares, "fairness to the minority requires more than simply a price that is within the range of fair results; the majority must also recognize the minority's interests and insure that the procedures it follows are fair." 94 Or App at 624. Defendant argues that the price was not within the range of fair results and that the procedures plaintiff followed were unfair.

We first consider whether the valuation of CRC's shares at $2,000 per share was appropriate. The principal difficulty in valuing CRC was that its worth might increase with time. Plaintiff presented evidence that defendant's half interest in CRC had a negative value of $600,000 at the time of trial. The valuation of $200,000 for the half interest came from an expert appraisal of the value of the shopping center accepted by the bank that made the construction loan for the project. Defendant's expert valued his half at $3,500,000 by projecting the value of a half-interest in the shopping center years from now. After reviewing the record, we find that the $200,000 value is within the range of a fair price for defendant's stock. Plaintiff has persuaded us that if the $3,500,000

figure was correct, defendant would have elected dissenter's rights. We, therefore, decline to tamper with the trial court's valuation.

■ We also conclude that plaintiff followed a fair and appropriate procedure when he made the buy/sell offer. He treated defendant as a 50/50 shareholder for purposes of the dissolution plan, so defendant's shares were not subject to a minority discount. The offer of dissenter's rights added to the procedural fairness.

■ Finally, defendant assigns error to the denial of his counterclaims for oppressive conduct, breach of fiduciary duty and breach of contract.[5] Defendant makes substantially the same arguments for oppressive conduct and breach of fiduciary duty that he advances in his first two assignments of error. They do not require discussion. In his counterclaim for breach of contract, defendant argues that the shareholder agreement did not allow plaintiff to collect a two percent fee on loans he arranged. Defendant alleges harm to the corporation, so his claim is derivative. Because he was not a minority shareholder and because he did not allege harm distinct to himself, defendant is not entitled to the exception to the rule that claims alleging harm to the corporation must be brought as a derivative action. Defendant's position was inapposite to that of the minority shareholders in *Noakes v. Schoenborn*, 116 Or App 464, 841 P2d 682 (1992). He did not have standing to raise the breach of contract claim.

Finally, defendant assigns error to the denial of request for a jury trial on his counterclaim for breach of contract. Because we conclude that he lacked standing to bring that claim, denial of a jury trial is moot. His other arguments do not merit discussion.

■ Plaintiff cross-assigns error to denial of his claim for damages for breach of contract. He argues, in essence, that

[5] Defendant's counterclaims for oppressive conduct and breach of fiduciary duty also named plaintiff's wife, Mary Wilcox, as a counterclaim defendant. The counterclaims against Mary Wilcox alleged that she breached her fiduciary duty to defendant by authorizing the issuance of the 125 new shares to plaintiff and that the authorization of the new shares was oppressive behavior. We have already concluded that the parties were deadlocked and that plaintiff's resolution of the deadlock was procedurally fair. We affirm the denial of defendant's counterclaims against Mary Wilcox on the same grounds.

defendant breached the shareholder agreement by not voting to dissolve the corporation. Because of the ensuing dispute, plaintiff argues, the bank withdrew a loan and plaintiff lost a loan fee that he was otherwise entitled to receive. We agree with defendant that the damages plaintiff seeks are too remote.

Affirmed on appeal and on cross-appeal.