**Richard HARRIS, Appellant,**

v.

**AHTNA, INC., Ahtna Government Services Corporation, Ken Johns, Paul Tony, and Neil Anderson, Appellees.**

No. S–10960.

Supreme Court of Alaska.

Feb. 11, 2005.

---

**12.** *French v. Jadon, Inc.*, 911 P.2d 20, 26 (Alaska 1996) (citing *State, Dep't of Highways v. Green*, 586 P.2d 595, 607 n. 32 (Alaska 1978)).

William G. Royce, Anchorage, for Appellant.

Christopher J. Slottee, Atkinson, Conway & Gagnon, Anchorage, for Appellee Ahtna, Inc.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

The main question in this case is whether the superior court properly ordered specific enforcement of a buy-or-sell agreement between shareholders. We conclude that the court erred because the offer that triggered the buy-or-sell process did not set out a price that was equal regardless of which party bought or sold, and contained unpermitted conditions.

**FACTS AND PROCEEDINGS**

In May of 1999 Richard Harris and Ahtna, Inc., formed Ahtna Government Services Corporation (AGSC). AGSC's primary business was to perform work for the federal government that is reserved for minority-owned enterprises. AGSC would qualify for this work because Ahtna is an Alaska Native regional corporation. Ahtna owned 5,100 shares, fifty-one percent, while Harris owned 4,900 shares, forty-nine percent. Harris was to manage the company and to contribute staff and office space from his company, Pacific Native Development Corporation, while Ahtna agreed to provide AGSC with working capital and bond guarantees.

Harris and Ahtna executed a shareholders agreement that contained a buy-or-sell provision described as a "put-and-call option." Under this provision either shareholder

could, under certain conditions, declare an "impasse" by issuing a declaration that contains an offer to sell the offeror's shares to the other shareholder. Upon receipt of the declaration, the offeree must either buy the offeror's shares or sell its own shares to the offeror at the set price.

The AGSC venture started slowly. In 1999 and 2000 it incurred losses. In May of 2001 the AGSC board of directors terminated Harris from his position as president of the company. In 2001 there were net earnings of approximately $160,000 on gross revenues of about $9,000,000. At the end of 2001 AGSC's balance sheet showed negative retained earnings of slightly over $1,000,000. At that point Ahtna had made loans to AGSC in excess of $1,500,000. The year 2002 was more profitable for AGSC. As of July 31, 2002, the company had made profits of about $700,000 on predicted annual gross revenues in excess of $12,000,000.

AGSC filed a complaint against Harris on October 19, 2001, claiming that he had breached his fiduciary duty to AGSC and that he had not paid for his stock. Harris answered, denying the major allegations of the complaint, counterclaimed against AGSC, and filed a third-party complaint against Ahtna. In the latter he alleged that an "impasse" between shareholders had arisen.

After the third-party complaint was filed, Ahtna sent a letter to Harris declaring an impasse under the put-and-call option of the shareholders agreement. Ahtna's declaration set the price for the purchase of shares as follows:

A. 6.87 per share;

B. the Continuing Shareholder shall assume any Company indebtedness or liability guaranteed by the selling shareholder, and shall obtain a written release of the selling shareholder from such guarantees and liabilities; and

C. the Continuing Shareholder will cause to be paid in full the valid indebtedness of the Company to the selling shareholder. In the case of the Company's indebtedness to Ahtna, the portion of the indebtedness represented by management fees will be waived and relinquished by Ahtna.

Harris responded to the offer contained in the declaration by agreeing to buy Ahtna's shares for $6.87 per share while rejecting parts B and C of the offer as invalid under the shareholders agreement. Ahtna took Harris's response to be a rejection of Ahtna's offer to sell its shares and thereafter claimed that Harris was obligated to sell his shares to Ahtna in accordance with the terms of the declaration.

Both Ahtna and Harris moved for specific performance of the put-and-call option. The superior court granted Ahtna's motion, denied Harris's, and ordered Harris to deliver all of his shares to counsel for Ahtna in exchange for the consideration specified in Ahtna's declaration. When Harris did not tender his stock, Ahtna filed a motion for an order holding Harris in contempt. The court issued an order to show cause. In response, Harris filed a supplemental brief arguing that the court had erred in granting Ahtna's motion for specific performance because Ahtna's declaration contained terms that made its offer invalid. Harris supported his supplemental brief with an affidavit of George L. Johnson, CPA, who stated that he had extensive experience working with put-and-call options, that it was critical that an offer be "symmetrical," and that Ahtna's declaration lacked symmetry because Ahtna demanded

> that Mr. Harris personally *repay* a corporate obligation of AGSC and assume a bonding guarantee of Ahtna.... Ahtna's Put Call offer is equivalent to Mr. Harris offering to sell his shares to Ahtna if Ahtna also repaid debt that Mr. Harris owed to a third party. (Emphasis in original.)

The superior court conducted an evidentiary hearing with respect to the order to show cause. At the conclusion of the hearing the superior court reaffirmed its prior ruling requiring Harris to deliver his stock to Ahtna's counsel. The court stated, in part:

> If somebody wants to sell something, they can say I'll take this or I'll take that and that's what Ahtna said. What they wanted was off the hook and it wanted so many dollars a share on top of that. They were extended financially in several ways on behalf of the company and that was

part of the deal. It certainly makes no sense to remain extended for the company if they're not an owner. It does make sense for the other shareholder, Mr. Harris, to cover the extension that . . . they've made. That's not an impossible thing.

These are people in companies involved in business and business is, to an extent, a poker game. You have to have enough stakes to play. Harris could assume the debt, he could pay the debt, Harris could find alternate bonding. Harris could do those things if Harris had a deep enough pocket to do it and he could pay for the shares as well. All of that together, of course, was the total price for the shares.

The superior court subsequently issued a partial final judgment pursuant to Alaska Civil Rule 54(b) requiring Harris to deliver his shares to Ahtna in exchange for $6.87 a share, totaling $33,663 for his 4,900 shares. Harris appeals.

## STANDARD OF REVIEW

■■■ The question in this case is the meaning of the put-and-call option in the parties' agreement. The goal in interpreting the meaning of contracts is to give effect to the reasonable expectation of the parties.[1] Reasonable expectations may be ascertained through the language of the contract, the behavior of the parties, case law, and any relevant extrinsic evidence.[2] Ordinarily the

meaning of a contract presents a question of law for the trial court, reviewable on appeal under the independent judgment standard unless there is conflicting extrinsic evidence.[3] Where there is conflicting extrinsic evidence, findings and inferences of fact made by the trial court will be reviewed deferentially under the clearly erroneous standard.[4]

■■■ In the present case there is no evidence as to the parties' intent concerning the put-and-call option at the time of contract formation or thereafter until this litigation arose, nor was there conflicting extrinsic evidence. We therefore review the trial court's interpretation of the put-and-call option under the independent judgment standard.[5]

## ISSUES ON APPEAL

The issues in this case turn on the meaning of the put-and-call option in the shareholders agreement. The subparagraphs of the agreement that are most relevant to this case provide:

5.1 Put and Call Options. Each Shareholder shall have the right and option upon the written declaration (a "Declaration") by such Shareholder to the other Shareholders and the Company of the occurrence of an "impasse" (as defined below) to sell to the Continuing Shareholders all of his Shares, and the Continuing Shareholders shall have the obli-

1. See Keffer v. Keffer, 852 P.2d 394, 397 (Alaska 1993) ("The goal in interpreting a contract is to give effect to the reasonable expectations of the parties."); Mitford v. de Lasala, 666 P.2d 1000, 1005 (Alaska 1983) ("In interpreting a contract, we seek to give effect to the reasonable expectations of the parties."); Peterson v. Wirum, 625 P.2d 866, 872 n. 10 (Alaska 1981) ("In interpreting a contract, the object is to give effect to the reasonable expectations of the parties.").

2. Jensen v. Ramras, 792 P.2d 668, 670 (Alaska 1990) ("The parties' reasonable expectations can be assessed by reviewing the language of the disputed provision, the language of other provisions of the contract, relevant extrinsic evidence, and case law interpreting similar provisions.") (quotation marks omitted); Smalley v. Juneau Clinic Bldg. Corp., 493 P.2d 1296, 1305 (Alaska 1972) ("[W]here uncertainty or ambiguity exists in the language employed in an agreement, the intent of the parties thereto may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the sur-

rounding circumstances at the time the contract was negotiated.") (quotation marks omitted).

3. Klosterman v. Hickel Inv. Co., 821 P.2d 118, 122 (Alaska 1991) ("although we will apply our independent judgment to a trial court's interpretation of a written contract based exclusively on documentary evidence, we will apply the clearly erroneous standard when the trial court has relied on extrinsic testimonial evidence").

4. Rockstad v. Global Fin. & Inv. Co., Inc., 41 P.3d 583, 586 (Alaska 2002) ("when the trial court relies on extrinsic testimonial evidence to provide a factual basis for its interpretation of a contract, we apply the clearly erroneous standard in reviewing the court's background findings of fact").

5. When reviewing the interpretation of contracts under the independent judgment standard, we "adopt[] the rule of law most persuasive in light of precedent, reason, and policy." Casey v. Semco Energy, Inc., 92 P.3d 379, 382 (Alaska 2004).

gation to either (i) purchase all of such Shares owned by the offering Shareholder in such proportion as the Continuing Shareholders may agree upon, and if they cannot so agree, pro rata in proportion to their then ownership of Shares of the Company (excluding the Offering Shareholder's Share) or (ii) if the Continuing Shareholders are unable or unwilling to purchase all of the Shares owned by the Offering Shareholder, sell all of their Shares to the Offering Shareholder, and the Offering Shareholder shall have the obligation to buy such Shares.

. . . .

5.3  Exercise of Option.  The Continuing Shareholders shall exercise any option provided for in this Paragraph 5 within thirty (30) days after receipt of a declaration.  Any closing of the sale of Shares pursuant to such exercise shall occur within ninety (90) days after receipt of a Declaration.

5.4  Purchase Price.  Any purchase or sale of Shares sold pursuant to this Paragraph 5 shall be at the price as set forth in the Declaration delivered by the Shareholder exercising his right to sell his shares and shall be paid for at the closing of the sale of the Shares.  The purchase price may be amortized, at the option of the Buyer, for a period of up to 3 years.

Harris argues that the put-and-call option (1) requires that the price be stated in monetary terms and precludes nonmonetary conditions, and (2) requires that the price be the same whether it is exercised by the offeror or the offeree.  He argues that neither of these requirements was met by Ahtna's declaration.  The price was not stated in monetary terms because the declaration required the buyer to assume unstated fixed and contingent liabilities and to obtain written releases of the seller from sureties of AGSC. The price Harris would be required to pay Ahtna was not equal to the price that Ahtna would have had to pay Harris; Harris would have been required to assume liabilities already incurred by Ahtna, whereas Ahtna had no similar obligation because Harris

had not guaranteed AGSC's bonds or made loans to AGSC.  Harris also contends that since terms B and C of the declaration were invalid, the court should have ignored them and enforced his offer to buy Ahtna's shares for the stated cash price per share.

Ahtna responds to these points as follows.  Regarding Harris's argument that the price under the agreement had to be expressed in monetary terms, Ahtna argues that the agreement does not so state.  It also argues that nonmonetary terms were necessary to allow Ahtna to divest itself of AGSC because of the substantial loans and guarantees it had made to AGSC or for its benefit.  Concerning price equality, Ahtna argues that "Ahtna's offer did not establish a different price per share."  But it continues by stating: "If Harris had matched Ahtna and put his own money at risk by loaning money to AGSC and guaranteeing AGSC's obligations, then his price per share would be the same."  Concerning Harris's argument that his acceptance of only the cash price term created a binding contract, Ahtna argues that Harris's response accepting only part of the offer was a rejection of the offer and created no contract.

We conclude for the reasons that follow that Harris has the better argument on his points that the price must be expressed in money and must be equal regardless of who sells and who buys.  But we conclude that Harris's argument that his acceptance of only the cash term of Ahtna's offer created an enforceable contract lacks merit.

## Equal Price

We address first Harris's point that the price under the put-and-call option must be equal regardless of which party buys.  Shareholders enter into buy-or-sell contracts in order to provide a deadlock-breaking mechanism that is fair to both participants.  The underlying premise of such agreements is that the price proposed by the offeror will be the same whether the offeror sells its shares or buys the shares of the other shareholder.  The fact that the offeree is free to buy or sell at the same price per share is the

offeree's guarantee of fairness.[6] Even where there is price equality, the contract may prove not to be fair if one party lacks the financial resources of the other party.[7] But the important point is that price equality is the basic assumption of agreements of this sort.

Price equality is lacking in Ahtna's declaration. If Harris decided to buy Ahtna's shares the price that he would have to pay would be calculated by adding to the $6.87 per share price his assumption of AGSC's liabilities to Ahtna, his assumption of Ahtna's guarantees, and whatever cost he would have to incur to obtain written releases from sureties of Ahtna's continuing liability. Ahtna has acknowledged that items B and C of its offer "involve sums substantially exceeding $1,000,000."[8] Thus Harris might well have had to pay, as buyer of Ahtna's shares, $35,037 ($6.87 per share times 5,100), plus an amount substantially in excess of $1,000,000. By contrast, Ahtna, as buyer of Harris's shares would have to pay only $33,633, $6.87 per share.

Ahtna's argument that the price would have been equal if Harris had matched Ahtna in making loans to AGSC and had been a co-guarantor of AGSC's bonding seems irrelevant. Those conditions did not exist, nor, apparently, was Harris obligated to lend funds to AGSC or act as a guarantor of its bonding. We thus agree with Harris that the put-and-call option required that the price to each party be equal and that the Ahtna declaration did not meet this requirement.

### Nonmonetary Terms and Conditions

We also agree with Harris's related point that the price in the declaration must be stated in money and must not contain nonmonetary conditions. We reach this conclusion for a number of reasons. Since the price must be equal regardless of who pays it, a medium of exchange available to both parties is required. Nonmonetary conditions often will not burden the parties equally. Relatedly, if nonmonetary conditions were permitted each party would have an incentive to declare an impasse before the other party in order to craft favorable conditions. This would lead to premature and possibly unnecessary deadlocks.

Further, the option available to the buyer to amortize the purchase price over three years, set forth in paragraph 5.4, implies that the price must be a money price. At oral argument before the superior court, counsel for Ahtna indicated uncertainty as to how to quantify the price reflected in part C of the declaration, acknowledging that he was not certain that this could be done.[9] An unquan-

---

**6.** *See Wyatt v. Phillips*, 2002 WL 31053832, *3 (Pa. Com. Pl. Aug 27, 2002), where the court stated concerning a similar agreement:

the purpose of the Provision was to attempt to control these contentious parties so that one could not take advantage of the other. An offeror could not make the price inordinately low for fear the other would counter-offer and purchase [the company] at the low price. On the other hand, if the price were too high, the offeror would become obligated to purchase in excess of the company's true value.

**7.** *See* Fredric D. Tannenbaum, *What Every Business Lawyer and Business Owner Should Know About Buy–Sell Agreements*, 1089 PLI/Corp. 441, 485 (Dec.1998) ("Theoretically, the offeree's right to buy out the offeror at the same price offered by the offeror will incite the offeror to quote a fair price, for fear that if the price is too low, the offeror will be bought out at that price. In reality, however, the offeror and offeree do not always have the same financial resources, and the offeree's rights to match a low offer by the offeror may be illusory.").

**8.** This statement was made in Ahtna's reply memorandum in support of its motion for an order holding Harris in contempt. The full statement was:

Contrary to Harris's repeated assertions, Ahtna's offer was not a one-part, $33,000 offer. It was instead a three-part offer which included the requirement that the selling [sic buying] shareholder assume all indebtedness guaranteed by the selling shareholder, obtain a release for the selling shareholder, and that all valid indebtedness to the selling shareholder be paid in full. The latter two elements of Ahtna's offer involve sums substantially exceeding $1 million.

**9.** The colloquy between court and counsel was:

THE COURT: Okay. Let's stop right there. Mr. O'Donnell, how can they quantify C?
MR. O'DONNELL (Ahtna's counsel): *Well, I'm not certain whether they can*. The arbitration is scheduled to. .... (*Emphasis supplied*.)
THE COURT: Well, let's find out. How can he accept? What would he have to do to

tifiable price, or a price consisting of contingent liabilities that have been assumed but not realized, cannot be amortized. The same is true as to a nonmonetary condition.

Moreover, the language of various other provisions of the shareholders agreement suggests that the parties intended the "price" term to be limited to a monetary price. In paragraph 3.3.3, the agreement states, concerning a shareholder's transfer of shares to the company, that "a Shareholder may give, sell, transfer or otherwise dispose of all or any of its Shares to the Company at such price *and on such terms and conditions* as such Shareholder and the Board of Directors of the Company may agree." (Emphasis added.) In another section of the agreement, paragraphs 3.3.4–6, the company and other shareholders are granted a first right of purchase when a shareholder proposes to sell to a third party. Paragraph 3.3.7 states that when the company or a continuing shareholder elects to purchase the shares from the selling shareholder under these provisions, the "Buyer must elect to purchase all Shares which the Offering Shareholder proposes to sell for the price *and upon the same terms for payment* of the price as are set forth in the Offer." (Emphasis added.) Finally, in paragraph 4.1 of the agreement, shareholders are given the right of first refusal to purchase common stock and options issued by the company, and the agreement requires the company to offer "such securities . . . at a price *and on such other terms* as shall have been specified by the Company in writing delivered to such Shareholder." (Emphasis added.) In contrast to these sections, the put-and-call option does not contain language referring to terms and conditions, stating instead that "[a]ny purchase or sale of Shares sold pursuant to this Paragraph 5 shall be at the price as set forth in the Declaration delivered by the Shareholder." The coupling of "price" with "terms" or "conditions" in other portions of the agreement but not in the put-and-call option suggests that the parties did not contemplate that the price in the put-and-call option would include terms and conditions in addition to a monetary price.

Ahtna's argument that nonmonetary conditions were necessary in order to relieve it of continuing liability to AGSC and to sureties is understandable, but unpersuasive. While the argument is relevant to Ahtna's perceived needs, it has little or no bearing on the meaning of the put-and-call option. The fact that Ahtna is a creditor of AGSC does not give it special status as a shareholder. Ahtna's remedies as a creditor of AGSC and as a guarantor of AGSC's obligations are separate from its rights as a shareholder. If Ahtna were to sell all of its shares, its remedies as a creditor and guarantor would still be available. If it believes that it needs more protection from the risk of nonpayment, this might logically be a factor when it decides what price to set under the put-and-call option. Just as buy-or-sell contracts may provide only illusory fairness when one shareholder cannot afford to buy out the shares of the other shareholder,[10] such agreements also may not function well when one shareholder does not believe that it can afford to let the other shareholder buy it out. But these shortcomings are, if anything, an argument against the use of such agreements rather than an indication of how they should be interpreted.

The parties have directed our attention to cases from other jurisdictions involving buy-or-sell agreements in which the offeror attempted to impose conditions in addition to a monetary price. In one case, *McTeague v. Treibits,* the court held that the conditions were invalid and that the offeree could accept the cash offer without the conditions.[11] In another case, *Wyatt v. Phillips,* the court

properly accept if there is some vagueness in the outcome or what it means?

. . . .

MR. O'DONNELL: What he would have had to do was clearly set out in the offer. One, he would have to pay the amount; two, he would have to agree to have obtained financing or take other steps to have removed Ahtna as a lender to the corporation and as a guarantor on its bonds and if there was indebtedness owing to Ahtna from Ahtna Government Services, make arrangements to get that paid. He was unwilling to do that.

10. *See supra* note 7.

11. 388 So.2d 309 (Fla.App.1980).

held that the imposition of the conditions prevented the triggering of the action-forcing aspect of the agreement, and that the offers as made should be treated under the common law rules of contract formation.[12] In a third case, *Wilcox v. Stiles*, the court held that a nonmonetary condition was valid and the agreement was triggered despite its inclusion.[13] Our holding in this case concerning the invalidity of nonmonetary conditions is consistent with *McTeague* and *Wyatt*. We disagree with the rationale of the third case, *Wilcox*, insofar as it approves of an offer that imposed unequal conditions depending on which party became the buyer.[14]

### Harris Is Not Entitled to Specific Performance

■ For the above reasons we have concluded that terms B and C of Ahtna's offer are inconsistent with the put-and-call option. Harris argues that since these terms are inconsistent with the put-and-call option, he should be able to purchase Ahtna's shares under the only valid term of the offer for $6.87 per share. He cites *McTeague v. Treibits*[15] in support of his argument.

*McTeague* involved a shareholders agreement with a buy-or-sell agreement similar to the put-and-call option in the present case. Under the *McTeague* agreement, when one shareholder (the initiating shareholder) notified the other shareholder (the responding shareholder) that the initiating shareholder wished to sell his shares, the responding shareholder would set the price and terms under which the initiating shareholder could either buy the responding shareholder's shares or sell his shares to the responding shareholder.[16] Treibits initiated the process. McTeague responded by stating a cash price and conditions, including payment of an amount claimed to be owing to a construction company owned by McTeague. Treibits purported to accept the offer with respect to the monetary price only, rejecting the additional conditions. The trial court ruled that the conditions other than the cash price were not in accordance with the phrase "price and terms" in the shareholders agreement and held that Treibits had the right to accept the monetary term and ignore the other conditions. The court of appeals agreed, noting that the construction company's claim against the corporation was currently in litigation and if the construction company prevailed the objective of the condition imposed by McTeague would be satisfied. *McTeague* is arguably distinguishable on the grounds that the main condition imposed would be independently satisfied if it was legitimate and, in any event, the condition was arguably less important than the invalid conditions set by Ahtna in the present case. Nonetheless, *McTeague* is fair support for Harris's position.

But *Wyatt v. Phillips*[17] and *Roy Herider Feed Co. v. Modern Feeds of Nacogdoches, Inc.*,[18] reach different and, in our view, more defensible results. In *Wyatt* the court noted that where a buy-or-sell clause (referred to there as a "shotgun" provision) similar to that in the present case "contained a number of contingencies, or conditions precedent, other than price and payment terms neither contained nor contemplated by the drafters of the Shotgun Provision," this would render the offer subject to "ordinary contract principles of offer and acceptance."[19] In *Roy Herider Feed* the trial court concluded on summary judgment that the "buy or sell"

---

12. 2002 WL 31053832, *4 (Pa.Com.Pl. Aug.27, 2002).

13. 127 Or.App. 671, 873 P.2d 1102 (1994).

14. We note however that *Wilcox* is arguably distinguishable because both the offeror and the offeree were personally liable for all the debts of the corporation. Thus the main condition, release of liability of the seller, was, at least theoretically, equal regardless of which party became the buyer. But one shareholder had substantial personal collateral at risk, while the other did not. Thus the practical risk of loss was asymmetrical even though the theoretical risk may have been equal.

15. 388 So.2d 309 (Fla.App.1980).

16. *Id.* at 311.

17. 2002 WL 31053832 (Pa.Com.Pl. Aug. 27, 2002).

18. 468 S.W.2d 554 (Tex.App.1971).

19. 2002 WL 31053832, at *4.

agreement was validly invoked despite the presence of conditions precedent. On appeal the court reversed, holding that the conditional nature of the offer prevented the action-forcing aspect of the agreement from being triggered. Instead, the court invoked customary contract provisions:

> [A]cceptance of a proposal to sell, in order to bind the maker of the proposition and conclude the contract, must be unconditional and unqualified. The exact terms of the proposition, without addition or variation, must be acceded to before the proposition is withdrawn; otherwise the maker of the proposition is not bound by the acceptance.[20]

We believe that the offer contained in Ahtna's declaration should be construed as were the conditional offers in *Wyatt* and *Roy Herider Feed*. Since the offer did not comply with the put-and-call provisions of the shareholders agreement it was an offer governed by the common law. Under common law rules acceptance of an offer must be "unequivocal and in exact compliance with the requirements of the offer." [21] Where a purported acceptance qualifies the terms of the original offer, the result is a counter-offer which may be accepted or rejected by the party who made the initial offer.[22] Here, since Ahtna's offer failed to trigger the put-and-call option, Harris's partial acceptance was a counter-offer that Ahtna did not accept. Thus no contract was formed and Harris's request for specific performance was properly denied.

For the above reasons, we REVERSE the partial final judgment and REMAND this case to the superior court for further proceedings consistent with this opinion.

---

**20.** 468 S.W.2d at 560 (quoting *Patton v. Rucker,* 29 Tex. 402, 409 (1867)).

**21.** *Thrift Shop, Inc. v. Alaska Mut. Sav. Bank,* 398 P.2d 657, 659 (Alaska 1965).

**22.** *See Southwest Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Alaska Marine Highway Sys.,* 941 P.2d 166, 173 (Alaska 1997); *Hall v. Add–Ventures, Ltd.,* 695 P.2d 1081, 1088–

1089 (Alaska 1985) ("If the terms suggested by Large constitute a conditional acceptance, it would be a counter-offer and thus a rejection of the original offer."); RESTATEMENT (SECOND) OF CONTRACTS § 59 (1981) ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer.").