H.A. "Bing" PRICHARD and Sherry
Dale Prichard, Appellants,

v.

Robert L. CLAY and Cherie Anderson,
d/b/a C.A.C. Partnership, Appellees.

No. S–3038.

Supreme Court of Alaska.

Sept. 15, 1989.

Joseph N. Barcott, Anchorage, for appellants.

Paul W. Waggoner, Anchorage, for appellees.

Before MATTHEWS, C.J., and
RABINOWITZ, BURKE, COMPTON
and MOORE, JJ.

OPINION

MOORE, Justice.

### I.

In September 1983, Robert L. Clay and Cherie Anderson (hereafter singularly and collectively "Clay") leased a commercial parcel in Fairbanks from William D. Sexton and Beverly A. Sexton. The 20–year lease contemplated the construction of a fast food restaurant. Taco Bell and Pizza Hut also had leased nearby parcels from the Sextons, so paragraph 6 of the Clay–Sexton lease provided that Clay would not serve or allow another to serve Mexican or Italian food.[1] The Clay lease also provided that Clay could assign the lease if he would "first obtain the written consent thereto of Lessor which consent shall not be unreasonably withheld."[2]

Clay built the restaurant, but the business was not successful. In 1986, H.A. "Bing" Prichard and Sherry Dale Prichard, owners of the Jack-in-the-Box franchise for Alaska, negotiated with Clay for the assignment of Clay's leasehold. At that time, Clay was delinquent on several financial obligations. According to Prichard, he raised concerns about paragraph six in the Clay lease, given that the Jack-in-the-Box menu included Mexican and Italian items,

and Clay, anxious to have Prichard assume the delinquent financial obligations, assured him that this was not a problem and that he would take care of it. Clay denies knowledge of the menu items and these discussions and assurances prior to signing the purchase agreement.

The Prichards signed a "purchase agreement" with Clay on July 8, 1986.[3] The purchase agreement provided that Prichard, "having read and reviewed the terms and conditions of the lease, [and] inspected the building and personalty contained therein, [is] desirous of purchasing the same." It was agreed that Prichard "shall purchase from Sellers their long-term leasehold interest." Clay "agree[d] to seek out and obtain the consent of Lessors on the land lease to the assignment of said lease." Prichard agreed to "assume the obligation of payment on the land lease for the property" as of July 1, 1986, and to assume the existing mortgage, but did not explicitly assume any other lease term. Possession was transferred to Prichard immediately. Clay "warrant[ed] full and complete title to the interest stated herein." The agreement concluded by stating that "[t]he foregoing represents the full and complete agreement of the parties. Closing shall take place within 120 days from the date [of July 8, 1986]."

1. Paragraph 6 of the lease states in full:
   USE OF PREMISES. Lessee will occupy and use the leased premises for construction and operation of a Weinerschnitzel or similar type restaurant. Lessee shall not use the leased premises for any other purposes without Lessor's prior written consent, which consent will not be unreasonably withheld if such other use is compatible with and not competitive or detrimental to the businesses then being conducted on Lessor's adjoining properties. Lessee covenants and agrees that it will not use or permit use of the premises for the operation of a pizza, Italian food, or Mexican food restaurant or for the sale of pizza, Italian or Mexican food from any other style restaurant business.

2. Paragraph 27 of the lease states in full:
   ASSIGNMENT AND SUBLETTING. Lessee shall have the right to assign this lease or to sublease the leased premises as an entirety provided Lessee shall first obtain the written consent thereto of Lessor which consent shall not be unreasonably withheld; and, provided further, that Lessee shall remain at all times

liable for the payment of all rentals herein required to be paid and for the performance of all terms, covenants and conditions herein undertaken by Lessee; and provided further that any such sublessees and assigns shall, by such sublease or assignment, become principally bound to Lessor hereunder, in addition to Lessee, as principal obligors, as if originally named as Lessees herein.

3. It appears from affidavits filed for purposes of summary judgment that Mr. Sexton also assured the Prichards that the Mexican and Italian items on Jack-in-the-Box's menu would not be a problem and that Sexton would "take care of it." It is not clear whether Sexton's assurances were made prior to or after the signing of the purchase agreement. Mr. Prichard claims such assurances were made "by the principals during negotiations." One affiant stated that Sexton made these assurances at an August 8, 1986, meeting. Another affiant claims Sexton made such assurances on July 12, 1986. The purchase agreement is dated July 8, 1986.

The Prichards took possession and incurred expenses in preparing the building for business. The Prichards opened the Jack-in-the-Box and began serving Mexican food items on their menu. Clay and Sexton obtained Pizza Hut's consent, but were unable to obtain Taco Bell's consent to the Prichards' serving these items in violation of paragraph six of the Clay–Sexton lease. Soon thereafter, Taco Bell stopped paying rent to Sexton. Sexton then refused to consent to the assignment and had Notices to Quit served on the Jack-in-the-Box premises. Prichard, realizing that the assignment would not be forthcoming, vacated the premises in December 1986 and incurred expenses in doing so. Prichard claims to have made substantially all payments required under the purchase agreement prior to vacating, but Clay contests this.

Clay filed suit on December 17, 1986, alleging that "[i]n July of 1986 [Clay] assigned and sold its interests in the property to Prichards" and that "[Clay] complied with all the terms of the purchase agreement." Clay claimed that Prichard breached the Purchase Agreement and caused Sexton to refuse to consent. Clay sought damages or specific performance. Prichard answered, asserting affirmative defenses and counterclaims. Prichard alleged that Clay knew at all times what Prichard planned to serve, that Clay failed to fulfill a condition precedent (obtain Sexton's consent), that Clay had made oral assurances, and that Prichards' expenses were incurred in reliance thereon. Prichard sought dismissal of Clay's complaint, compensatory damages of $50,000, and punitive damages for intentional misrepresentation. In reply to Prichards' counterclaim, Clay raised the affirmative defense that Prichards' "claims of oral or written representations are barred by the Parol[ ] Evidence Rule."

Both parties moved for summary judgment in April, 1987, submitting numerous affidavits. Judge Joan M. Katz heard oral argument on September 9, 1987. Despite seeing the equities in Prichards' favor, Judge Katz tentatively ruled that Prichard had interfered with Sexton's consent, that

the Clay–Sexton lease was part of the Prichard–Clay purchase agreement, and that the parol evidence rule precluded evidence of Clay's and Sexton's oral assurances to the Prichards. Judge Katz finalized her ruling by order dated September 17, 1987. The parties stipulated to damages of $615,105.38, with the Judgment reflecting this amount less $54,600 in "rent" due from Clay to the Prichards.

The Prichards appeal the granting of Clay's summary judgment motion.

## II.

A primary issue in this case is whether the parties intended the Clay–Prichard purchase agreement to incorporate all of the terms and restrictions in the Clay–Sexton lease.

At oral argument in superior court, the Prichards argued that the purchase agreement was not intended to incorporate the lease provisions in their entirety, and that the parties intended that the Jack-in-the-Box would serve Mexican food items immediately upon opening. Judge Katz ruled that the purchase agreement incorporated the Clay–Sexton lease provisions in their entirety so that sale of Mexican food items was a breach of the agreement.

We conclude that the agreement's reference to the lease falls short of an incorporation of its terms. Parties do not undertake obligations contained in a separate document unless their contract clearly says so. This is especially true where the referenced instrument was executed by different parties at a different time and pursuant to a different transaction. "A reference to a former paper . . . is in no sense a re-adoption of the former provisions; and it certainly cannot have the effect of importing into a new contract the conditions and limitations of the former agreement." *Frierson v. International Agricultural Corp.*, 24 Tenn.App. 616, 148 S.W.2d 27, 35 (1941); *see also M.J. Delaney Co. v. Murchison*, 393 S.W.2d 705, 709 (Tex.Civ.App. 1965); *cf. Modern Construction, Inc. v. Barco, Inc.*, 556 P.2d 528, 530 (Alaska 1976). A reference in a contract to another

document will incorporate the other document only to the extent indicated and for the specific purpose indicated. *See Lincoln Welding Works, Inc. v. Ramirez*, 98 Nev. 342, 647 P.2d 381, 383 (1982); 17A C.J.S. *Contracts* § 299, at 137 (1963); 17 Am.Jur.2d *Contracts* § 263, at 667 (1964).

■ The present contract, while evidencing the parties' knowledge of the lease terms and conditions, falls far short of an agreement to abide by them. Based upon the record before us, we conclude that the trial court erred in interpreting the purchase agreement to incorporate the burdens and restrictions of the Clay–Sexton lease.

## III.

■ The court's error in concluding that the purchase agreement included an assumption of all the lessee's obligations under the lease necessarily means that the parol evidence rule was not properly applied in this case. Whether the purchase agreement incorporated the lease provisions does not involve the parol evidence rule at all, since the question is what the contract means. Thus, the court's first duty is to determine the meaning of the contract, and extrinsic evidence is admissible for this purpose. *See Alaska Diversified Contractors, Inc. v. Lower Kuskokwin School District*, 778 P.2d 581 (Alaska 1989); *Alyeska Pipeline Service Co. v. O'Kelley*, 645 P.2d 767, 771 n. 11 (Alaska 1982). The lease supplied the basis for concluding that the Prichards were not allowed to serve Mexican food under their purchase agreement with Clay. Since the purchase agreement did not incorporate the no-Mexican food proviso of the lease, the question becomes whether Clay's obligation to obtain Sexton's consent to the assignment is a condition precedent. If so, it remains to be decided whether the Prichards prevented or hindered the occurrence of the condition or whether Clay assumed the risk that Sexton might not approve the assignment because of the nature of the menu items in Prichards' restaurant. It is clear, for the reasons that follow, that obtaining approval of the assignment was a

condition. However, there is a question of fact as to who between the Prichards and Clay bears the risk of Sexton's refusal to approve the assignment.

## IV.

■ The Prichards argue that their duty to complete the transaction was subject to the condition precedent that Clay obtain the Sextons' consent to the assignment. This never having occurred, the Prichards argue that their duty to perform never matured. Clay argues that the Prichards prevented the Sextons from consenting, so the Prichards' performance was not excused. Judge Katz ruled that the Prichards, by serving Mexican food, prevented Clay from obtaining the Sextons' consent. Judge Katz held that the Prichards' performance was not excused by the non-occurrence of the condition precedent.

A condition precedent

is a fact or event which the parties intend must exist or take place before there is a right to performance.... If the condition is not fulfilled, the right to enforce the contract does not come into existence. Whether a provision in a contract is a condition ... depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract.

5 S. Williston, *Williston on Contracts* § 663, at 126–27 (3rd ed. 1961); *see Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1165 (Alaska 1987); *Jones Assoc. v. Eastside Properties, Inc.*, 41 Wash.App. 462, 704 P.2d 681, 684 (1985); Restatement (Second) of Contracts §§ 224, 225 (1981). Conditions are not favored, and will not be construed as such unless they are "expressed in plain, unambiguous language or arise by clear implication." *Peterson v. Wirum*, 625 P.2d 866, 873 (Alaska 1981); *see Logghe v. Jasmer*, 686 P.2d 694, 698 (Alaska 1984); *Ross v. Harding*, 64 Wash.2d 231, 391 P.2d 526, 530–31 (1964).

Assignment of the lease was the principal if not sole object of the purchase agreement and without the Sextons' consent, the

lease could not be assigned. Clay "agree[d] to seek out and obtain the consent of Lessors on the land lease to the assignment of said lease." This language, although indicative of a covenant rather than a condition, does not overcome the clear implication that this is a condition precedent. Construing Clay's obligation as a condition precedent is the only construction which implements the clear intentions of the parties, for neither side reasonably could have contemplated consummation of the deal without the lease assignment. It would be reasonable to void the entire transaction if the Sextons' consent could not be obtained. *See Peterson,* 625 P.2d at 873. We therefore hold that the Sextons' consent to the assignment was a condition precedent to the Prichards' duty to complete the transaction.

## V.

■ The Prichards' duty to perform may have matured despite the condition's nonoccurence if they prevented or hindered its occurrence. *See Murray E. Gildersleeve Logging Co. v. Northern Timber Corp.,* 670 P.2d 372, 376 (Alaska 1983); *Fairbanks Builders, Inc. v. Morton De Lima, Inc.,* 483 P.2d 194, 195 & n. 2 (Alaska 1971); 17 Am.Jur.2d *Contracts* § 427, at 882 (1964). The "prevention doctrine is subsumed in" the implied covenant of good faith and fair dealing. *Mitford v. de Lasala,* 666 P.2d 1000, 1006 (Alaska 1983).

Judge Katz found that the Prichards' serving of Mexican food prevented Clay from getting the Sextons' consent to the assignment. However, this finding was based solely on the court's interpretation of the purchase agreement without any consideration of other extrinsic evidence, including the oral assurances allegedly made by Clay and the Sextons to the Prichards. Had the court fully evaluated this other evidence, an entirely different finding favorable to the Prichards, rather than Clay, may have been the result.

What is disputed is whether the Prichards' serving of Mexican food, prior to the contemplated closing date of November 8, 1986, was authorized or approved by the Sextons or Clay, or was within the reasonable expectations of the parties to the purchase agreement. If it was, then the Prichards did not hinder or prevent Clay from getting Sextons' consent, and Clay cannot claim this as an excuse for failing to obtain the consent which he promised to obtain. On the other hand, if the Prichards' serving of Mexican food was not authorized or approved, or within the reasonable expectations of the parties to the agreement, then it may have interfered with or prevented Clay's ability to obtain Sextons' consent to the assignment. There may also have been other independent causes, such as Taco Bell's refusal to pay rent. This, as previously noted, turns on the resolution of these disputed questions of fact concerning the parties' discussions prior to signing the purchase agreement. These questions must be resolved at trial.

REVERSED and REMANDED.