Harvey SHADE and Anna Shade, Appellants,

v.

CO & ANGLO ALASKA SERVICE CORP., d/b/a Peak Oilfield Services, and Peak Alaska Ventures, Inc., d/b/a Peak Maintenance and Equipment Co., and Grove Manufacturing Co., d/b/a Grove Manlift, Appellees.

No. S–6605.

Supreme Court of Alaska.

Sept. 8, 1995.

Charles W. Coe, Anchorage, for appellants.

Alex K.M. Vasauskas and Timothy M. Stone, Stone, Waller, Jenicek, Brown & Gibbs, Anchorage, for appellees Peak Oilfield Services and Peak Alaska Ventures, Inc.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MOORE, Chief Justice.

### I. INTRODUCTION

Harvey Shade alleges that he was injured when a manlift that he was operating during his employment with ARCO Alaska unexpectedly shifted into high speed. Shade and his wife Anna sued Grove Manufacturing Company d/b/a Grove Manlift (Grove), the manufacturer of the manlift, and Peak Oilfield Services and Peak Alaska Ventures, Inc. d/b/a Peak Maintenance and Equipment Company (Peak), an independent contractor hired to maintain ARCO's manlifts, for negligent repair, breach of implied warranty of repair, products liability, and loss of consortium. The trial court entered summary judgment in favor of Peak, dismissing the Shades' complaint against the contractor in its entirety. The Shades challenge this decision, as well as a subsequent award of attorney's fees. Because we conclude that the summary judgment dismissal of Peak was improper, we reverse.

### II. FACTS AND PROCEEDINGS

For purposes of this summary judgment motion, the following facts are undisputed. Harvey Shade worked as a heavy equipment mechanic for approximately twenty years, during which time he repaired and maintained manlifts for ARCO, including those manufactured by Grove. In 1988 ARCO closed down the mechanic's shop where Shade worked and contracted the repair and maintenance of its heavy equipment to Peak.

Shade was reassigned as a heavy equipment operator, which required the delivery of heavy equipment to work sites for use by ARCO personnel.

On September 17, 1988, Shade's superior directed him to pick up a Grove manlift and deliver it to a remote work site. Shade picked up a Grove manlift referred to as the "PB 1470." Before attempting to load the manlift for transport, Shade inspected it. He noticed no red tags which would indicate that the equipment was not functional. He also performed an operational test of the manlift, in which he did a "walk around," listened to the engine, and operated the controls from the basket. Shade specifically did an operational test of all of the switches, including the high/low speed switch. The operational test performed by Shade was designed to check a specific safety feature: with the basket raised, the operator should be unable to place the Grove manlift into high gear.

When Shade later attempted to unload the manlift at the work site, however, it apparently malfunctioned. Shade was backing off a tilt trailer with the throttle in low gear and the basket raised. When Shade was halfway down the ramp, the engine suddenly shifted into high gear by itself and threw him into the air. As a result, Shade broke his ankle and leg.

The Shades brought suit against Grove and Peak in July 1993. The complaint alleged that under Peak's contract with ARCO, Peak was required to repair, maintain, monitor, and inspect the heavy equipment which Shade used. The Shades asserted that the injuries suffered by Shade were proximately caused by Peak's negligence in failing to properly repair the manlift, as well as Peak's breaches of both the contract to repair and an implied warranty of workmanship.

Peak moved for summary judgment. In support, Peak presented Harvey Shade's deposition testimony, in which he described inspecting the Grove manlift before using it on September 17 and observing no malfunction with the speed control switch. Peak also attached the affidavit of Don York, a Peak mechanic who went to the scene shortly following the accident to examine the manlift.

York affied that he operated the manlift in all of its functions, "including the manlift's high and low speed mode," and found no indication of any malfunction. York further stated that the lift appeared to operate normally when it was loaded back onto the trailer and off-loaded at the shop, and that after additional inspection in the shop, he determined that the speed mode switch was operating in proper condition. Based upon this evidence, Peak argued that the manlift was functioning properly before and after the accident and, even if there were a defect, that "Peak could not have been reasonably expected to discover that there was anything malfunctioning with the manlift before Mr. Shade ... was injured."

In opposition, the Shades first attempted to characterize the location where Shade picked up the manlift on September 17 as an implied certification by Peak that the manlift was safe to operate. Shade and another operator, Parnell Lockhart, affied that the PB 1470 had been placed on the "ready line" that day, an area where mechanics routinely placed completely repaired and inspected equipment after it had been worked on.

The Shades also submitted a Peak repair report for the PB 1470 dated September 17, 1988. At the top of the report next to a space marked "Problem" was written, "Travel & eng[ine] controls touchy." Below, York indicated that he "[checked] out [the] operation of control for travel." As a result, four switches were ordered.[1] Next to the repair entry was the indication "0900," which York later explained is a "miscellaneous" task code—not an indication for 9:00 a.m. York testified that he recalled performing this particular repair late in the afternoon on September 17, after the accident. However, York admitted that based upon the work order itself, one cannot determine what time of day the repair was performed.

The Shades also submitted evidence of some difficulty that Shade experienced on the day of the accident while initially loading the PB 1470 manlift onto the tilt trailer for transport. Shade explained that as was required for loading and unloading, he had the manlift in low gear with the basket raised. Shade testified that once all four wheels were on the tilt, the manlift was unable to climb. Shade stated that it was necessary to have Lockhart raise the rear of the manlift with a forklift so that Shade could drive straight onto the trailer. Shade affied that although the manlift was not switching gears at that time, the PB 1470 "was not moving right."

Finally, the Shades attempted to directly link Peak's repairwork to the malfunction that allegedly caused Shade's injury. Shade testified that in his opinion, the manlift shifted into high gear due to "a malfunction in the wiring." He explained that Peak could have detected a defect such as this before the accident by performing an operational test, or by opening up the machine. Shade stated that inside the machine, Peak should have been able to discover cracks in the wiring or wires touching, or Peak could have used a continuity tester to learn if any leads were grounded to the speed control switch.

Lockhart, who had ten years of experience as a heavy equipment operator, provided additional information. He testified that prior to and after Shade's accident, employees discussed "ongoing" problems with manlifts shifting from low to high gear unexpectedly. Lockhart stated that he personally experienced a sudden change in speed on at least two or three occasions, and that when the speed change occurred, the lift became unstable and felt like a "teeter-totter." Lockhart stated that the most recent time that he experienced an unexpected speed change was three weeks to six months before Shade's accident. Although he could not recall whose mechanics were then manning the shop, he testified that at that time, ARCO had gotten rid of all of its own mechanics. Lockhart recalled that on that occasion, as he did every time that he experienced a problem with a piece of equipment, he wrote up the problem and turned it in to the dispatcher. Lockhart explained that employees were *required* to document problems with machines, and that afterwards, the dispatcher would turn the forms over to the mechanic's shop.

---

1. In his deposition, York stated that he did not know what the four switches were intended for or whether he was the mechanic who ordered them.

After reviewing the evidence, the trial court granted summary judgment in favor of Peak. The court noted that while the jury has significant latitude in making a finding of negligence, in the present case, it would be necessary for the jury to "speculate" in order to find a connection between Peak's conduct and Shade's injury.

The Shades moved unsuccessfully for reconsideration, and the trial court certified the judgment as final. The clerk awarded Peak costs, and the trial court awarded Peak 20% of its attorney's fees.

This appeal followed.

## III. *DISCUSSION*

This appeal allows us to revisit some of the important principles underlying Alaska Civil Rule 56 and the law of summary judgment. As Peak frames the question presented by this case, "[t]he determinative issue ... does not involve the question of whether or not the manlift malfunctioned.... In order to avoid summary judgment dismissal, [the] Shades were obligated to present some admissible, material evidence demonstrating that Peak's negligence proximately caused Mr. Shade's injury." The trial court impliedly agreed with Peak's characterization of the purpose of these proceedings, and it ultimately concluded that the Shades had not carried their evidentiary burden. We believe that the trial court's assessment of the Shades' evidence was premature, and we therefore reverse.

■ It is well settled that when reviewing a grant of summary judgment, we must determine whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Broderick v. King's Way Assembly of God Church,* 808 P.2d 1211, 1215 (Alaska 1991). Because a premature grant of summary judgment forecloses a litigant's right to trial, however, we must be mindful that both on appeal and at the trial level, it is the moving party that bears the initial burden of proving, through admissible evidence, the absence of

genuine factual disputes and its entitlement to judgment. *Id.; Williams v. Municipality of Anchorage,* 633 P.2d 248, 250 (Alaska 1981) ("[T]he party seeking summary judgment 'has the entire burden of proving that his opponent's case has no merit.' ") (quoting *Nizinski v. Golden Valley Elec. Ass'n,* 509 P.2d 280, 283 (Alaska 1973)). The non-moving party is given the benefit of all reasonable inferences which can be drawn from the proffered evidence. *Deal v. Kearney,* 851 P.2d 1353, 1361 (Alaska 1993). Moreover, although prudent counsel for the non-moving party will always attempt to demonstrate a genuine issue for trial, it is not obligated to do so until the moving party makes a prima facie showing of its entitlement to judgment on established facts. Alaska R.Civ.P. 56(c), (e); *Broderick,* 808 P.2d at 1215; *Weaver Bros., Inc. v. Chappel,* 684 P.2d 123, 126 (Alaska 1984) (holding that when movant does not satisfy initial burden, non-moving party need not present opposing evidence and summary judgment must be denied); 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2727, at 143–46 (1983) (noting that under parallel federal rule, burden of production shifts to opposing party only when movant "makes out a prima facie case that would entitle him to a directed verdict if uncontroverted at trial").

■ In their complaint, the Shades allege that Peak failed to properly "repair, maintain, monitor, and inspect" the PB 1470 manlift, and in doing so, acted negligently and/or in violation of the express or implied terms of its contract with ARCO. Both parties cite *Alvey v. Pioneer Oilfield Services,* 648 P.2d 599 (Alaska 1982), for the elements of the Shades' claim against Peak. In *Alvey* we stated that in a negligence action, summary judgment is inappropriate when there is a genuine issue for trial concerning whether (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached its duty; (3) the plaintiff was injured; and (4) the injury was proximately caused by the defendant's breach.[2] *Id.* at 600. Thus, in the

---

2. The parties do not specifically address what standard applies to the claims raised by the Shades for Peak's breaches of the repair contract and an implied warranty of workmanship. During oral argument below, Peak briefly cited case law for the proposition that Alaska does not

absence of a meritorious affirmative defense, in order to obtain summary judgment, Peak must demonstrate the absence of a factual dispute as to at least one necessary element of the Shades' case.

Our review of the evidence offered by Peak in support of its motion for summary judgment leaves us unconvinced that Peak has carried this burden. First, Peak presented the deposition testimony of Harvey Shade, in which he recalled performing his own operational test on the PB 1470 before picking it up on the day of the accident; he tested the speed control switch and apparently found nothing malfunctioning. Peak infers from this that if *Shade* could find no problem, its mechanics could not reasonably have been expected to have discovered any defect. The record does not make clear, however, whether Shade's inspection of the PB 1470 as an *operator* was as thorough as the inspection that a reasonable *mechanic* would have performed. Standing alone, the fact that Shade inspected the PB 1470 before using it does not indicate, for the purposes of summary judgment, that Peak was free from negligence.

Second, Peak offered evidence that its mechanic, Don York, operated the PB 1470 manlift in its high and low speed mode at the scene shortly after the accident and again back at the shop and found the equipment to be in proper operating condition. Peak therefore implies that because its mechanics could not duplicate the malfunction or discover an actual defect during the post-accident inspection of the PB 1470, they could not have done so beforehand and prevented Shade's injury. While we consider such evidence probative, York's testimony cannot shift to the Shades the burden of producing evidence of negligence without some further

evidence of the standard against which Peak's conduct is to be measured.

We believe that in order to demonstrate that its conduct prior to the accident was reasonable, as Peak attempted to do in its summary judgment motion, it was incumbent upon Peak to present some evidence of the following: the appropriate standard for maintenance of the Grove manlift, the manner in which Peak had maintained the PB 1470, and whether that maintenance met or exceeded the appropriate standard. Peak chose not to support its motion with affidavits or other evidence relevant to any of these fundamental questions. In the absence of such evidence, Peak failed to demonstrate that it was entitled to summary judgment.

Similarly, Peak has argued that the Shades' breach of contract claim cannot stand because the Shades failed to present explicit language from the contract between Peak and ARCO outlining Peak's duties in maintaining ARCO's heavy equipment. Based upon the same analysis as presented above, we do not agree. If Peak desires to seek summary judgment on the Shades' breach of contract claim, as the moving party, Peak is required to demonstrate that no genuine issue of material fact exists. Because Peak chose not to support its motion by presenting evidence pertaining to the contract, the fact that the Shades have not done so is immaterial. *Weaver Bros., Inc.*, 684 P.2d at 126.

Because Peak has failed to satisfy its initial burden to demonstrate the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, we reverse the decision of the trial court which granted summary judgment in favor of Peak.[3]

recognize implied warranties for repairs. *See Swenson Trucking & Excavating, Inc. v. Truckweld Equip. Co.*, 604 P.2d 1113, 1119 (Alaska 1980). However, *Swenson* is inapposite to the present case. In *Swenson* we held that a contract for repair services does not fall under the provisions of article two of the Uniform Commercial Code. *Id.* at 1119. The U.C.C. has not been invoked here.

We believe that the general principles of *Alvey* provide a uniform standard for all of the Shades' claims on review. In *Pepsi Cola Bottling Co. v. Superior Burner Service Co.*, 427 P.2d 833 (Alaska

1967), we reviewed jury instructions in an action for improper repair of a boiler. We held that "[w]hether the tort standard of care is considered, or the duty of care imposed by an implied warranty of workmanlike performance ... the resultant standard of care required ... is identical." *Id.* at 840.

3. Because we reverse the case on these grounds, we need not reach the Shades' remaining points on appeal: (1) whether the trial court abused its discretion when it denied the Shades' motion for

### IV. CONCLUSION

For the reasons set forth above, the entry of summary judgment in favor of Peak is REVERSED and the case REMANDED for further proceedings.

EASTAUGH, J., not participating.

reconsideration; and (2) whether the trial court

erred in awarding Peak fees and costs.