**Troy JARVIS, Appellant,**

v.

**Gary ENSMINGER, James Johnson, Motors, Inc., and Fairbanks Nissan, Inc., Appellees.**

**No. S–11581.**

Supreme Court of Alaska.

May 5, 2006.

---

Kevin T. Fitzgerald, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellant.

Mark E. Wilkerson and Wallace H. Tetlow, Wilkerson, Hozubin & Burke, Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Troy Jarvis was hired as the sales manager at Fairbanks Nissan. His employment contract included a performance incentive: by meeting certain sales benchmarks he could earn an option to purchase as much as thirty percent of the shares in Fairbanks Nissan's parent corporation, Motors, Inc. Jarvis met those benchmarks but Motors refused to honor his option. Jarvis sued, claiming breach of contract, misrepresentation, and promissory estoppel. The superior court granted summary judgment to Motors, holding that the contract contained an unsatisfied condition precedent and that defendants were entitled to judgment regarding Jarvis's misrepresentation and promissory estoppel claims. Jarvis appeals. We affirm the superior court in regard to Jarvis's contract claim but reverse and remand in regard to his misrepresentation and promissory estoppel claims.

## II. FACTS AND PROCEEDINGS

### A. Facts

Fairbanks Nissan, Inc. is a subsidiary of Motors, Inc. Prior to July 10, 1997 all 7,500 outstanding Motors shares were held by the James E. Johnson Revocable Trust ("Johnson Trust"), of which James E. Johnson was, and is, the trustee and beneficiary. On July 10, 1997 the Johnson Trust and Gary Ensminger, the general manager of Fairbanks Nissan, executed a shareholder agreement issuing 7,500 new Motors shares to Ensminger. The shares were issued to Ensminger on August 26, 1997.

The shareholder agreement specified that Johnson and Ensminger would compose the board of directors of Motors, with Johnson serving as president and Ensminger as secretary/treasurer.[1] Even though the share-

---

1. The agreement also stated that on September 1, 2000 the respective positions would be switched.

holder agreement rendered Ensminger and the Johnson Trust co-owners, each holding fifty percent of the outstanding shares in Motors, the shareholder agreement specified that Johnson, both as the trustee of the Johnson Trust and as president of Motors, would retain corporate control until September 1, 2000.[2]

The agreement established three ways in which the shares held by the Johnson Trust might be obtained by Motors. When Johnson reached the age of seventy, the corporation would receive a "call option" and the Johnson Trust would receive a "put option." The call option entitled Motors to purchase the shares held by the Johnson Trust and the put option entitled the Johnson Trust to sell those same shares to the corporation. The price for the shares under either option was to be determined by an agreed-upon formula contained in the shareholder agreement. Additionally, the agreement specified that upon Johnson's death, the corporation was obligated to purchase the shares held by the Johnson Trust.

Ensminger recruited Jarvis to work as the general sales manager of Fairbanks Nissan in November 1997. Jarvis and Ensminger initially agreed that Jarvis would receive six and one-half percent of the gross sales profit for new and used cars as commission. This compensation package was amended by a written agreement on February 1, 1998.[3] The February 1 agreement specified that Jarvis would receive only six percent of the gross sales profit, but would also receive an option to buy up to thirty percent of the shares in Motors, or 4,500 shares, if he met certain sales benchmarks. The agreement further stated that "[t]he percentage that is

being made available are Jim Johnson Trust shares which must first be bought from Jim Johnson by Gary Ensminger/Fairbanks Nissan." Additionally, the agreement established a time frame within which Jarvis could exercise his option. If Jarvis met his benchmarks, the agreement stated that "[t]he performance option stock transfer will be exercised after the purchase from Jim Johnson Trust account by Gary Ensminger/Fairbanks Nissan or December 31, 2000, whichever is [later]."

On November 27, 1998 Ensminger and the Johnson Trust amended the shareholder agreement to provide Ensminger with the option of buying the Johnson Trust shares between September 1, 2000 and October 15, 2000.

Shortly after executing this amendment, Ensminger and Johnson had a falling out and Ensminger was terminated on February 26, 1999.[4] Ensminger never exercised any option to purchase shares from the Johnson Trust. At the time of Ensminger's termination, Motors had not exercised its call option and the Johnson Trust had not exercised its put option.

Jarvis left his job with Fairbanks Nissan in February 2001. On February 9, 2001 he sought to exercise his option to purchase 4,500 shares of Motors.[5] Johnson refused and Jarvis sued.

## B. Proceedings

Jarvis filed suit against Ensminger, Johnson, Motors, and Fairbanks Nissan in July 2002, seeking $100,000 in compensatory damages plus undetermined punitive damages. Jarvis alleged that the failure to honor his

---

2. The trust accomplished this in two ways. First, it stipulated that until September 1, 2000 the Johnson Trust must approve of any corporate act. Second, it also stipulated that if the board of directors disagreed (the board was composed only of Johnson and Ensminger), the president's decision would control. Until September 1, 2000 Johnson was to serve as president.

3. There is some dispute over whether Johnson personally consented to Jarvis's contract, but Ensminger's authority to bind Motors is not at issue in this appeal.

4. Jarvis replaced Ensminger as general manager of Fairbanks Nissan. Ensminger contended in

an affidavit attached to defendants' January 7, 2004 renewed motion for summary judgment that Jarvis subsequently renegotiated his employment terms with Johnson after taking Ensminger's job. This affidavit is the only evidence in the record that Jarvis renegotiated the February 1, 1998 contract. However, on appeal, neither party has placed any significance on the alleged renegotiation.

5. Defendants do not argue that Jarvis failed to meet the performance benchmarks that entitled him to the option.

option breached the explicit terms of his contract as well as the implied covenant of good faith and fair dealing. He also claimed misrepresentation and promissory estoppel. Jarvis argued that because the defendants acted with intentional bad faith he is entitled to punitive damages. On September 19, 2002 the defendants answered the complaint and asserted several affirmative defenses—including an assertion that no relief could be granted based on Jarvis's claim because the February 1, 1998 employment agreement contained an unfulfilled condition precedent. Defendants contended that Jarvis's purchase option was conditioned on Motors obtaining shares from the Johnson Trust, and that since neither Motors nor Ensminger ever obtained any shares from the Johnson Trust, Jarvis's purchase option never ripened.

Defendants moved for summary judgment in July 2003 based on this last affirmative defense. The motion for summary judgment did not address Jarvis's claims for misrepresentation or promissory estoppel. Jarvis replied that the contract specified that he could exercise his option either upon the purchase by Motors of Johnson Trust shares or on December 31, 2000, whichever occurred later. Jarvis maintained that the issuance of 7,500 shares to Ensminger pursuant to the July 10, 1997 shareholder agreement[6] counted as a relevant purchase of Johnson Trust shares. Consequently, Jarvis contended that his option ripened on December 31, 2000.

In an October 29, 2003 order, Superior Court Judge Morgan Christen denied the defendants' summary judgment motion without prejudice. The court observed that it could rule on the condition precedent as a matter of law. This was the superior court's only reference to the condition precedent in this case. The court held, however, that there existed a factual dispute as to whether the parties had intended for the 7,500 shares held by Ensminger at the time of agreement to be subject to Jarvis's purchase option.

Defendants moved for reconsideration, claiming that the parties could not have intended for Ensminger's 7,500 shares to be subject to Jarvis's option because the contract "contemplate[d] an option to purchase Johnson shares that at some point in time *after* the signing of the Jarvis Agreement, might be bought by Ensminger from *Johnson*." (Emphasis in original.) The superior court appeared to accept this argument[7] but rejected the motion without prejudice since it remained unclear whether the 7,500 shares were transferred to Ensminger before the signing of the February 1, 1998 employment agreement.

In response to this order defendants produced the stock certificate reflecting that the 7,500 shares had been transferred to Ensminger on August 26, 1997 and renewed their motion for summary judgment. The court granted this renewed motion for summary judgment in March 2004. Jarvis appeals this ruling.

## III. STANDARD OF REVIEW

We review a superior court's decision to grant summary judgment *de novo*, drawing all reasonable factual inferences in favor of the non-movant and affirming if the record reveals no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[8]

■ The meaning of a contract is ordinarily a question of law that we review *de novo*.[9] If the superior court weighed conflicting extrinsic evidence in interpreting the contract, we apply the more deferential clearly erroneous standard to the conclusions drawn by the

6. In his opposition to the motion for summary judgment, Jarvis stated that the shareholder agreement was dated July 10, 1998—though he admitted in a footnote that there was some confusion as to whether the correct year was 1997 or 1998.

7. The court's Order on Motion for Reconsideration, dated December 31, 2003, rejected summary judgment because "assertions of uncontested facts in the pleading were disputed at oral argument. This includes the date the initial shares of stock were transferred to Ensminger."

8. *Matanuska Electric Ass'n, Inc. v. Chugach Electric Ass'n, Inc.*, 99 P.3d 553, 558 (Alaska 2004).

9. *Harris v. Ahtna,* 107 P.3d 271, 274 (Alaska 2005).

superior court from the extrinsic evidence.[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Granting Summary Judgment on the Contract Claims.

The superior court granted summary judgment based on its conclusion that Jarvis's option was conditioned on a future purchase of Johnson Trust shares by Ensminger or Motors [11] and its finding that the parties did not intend for the 7,500 shares acquired by Ensminger pursuant to the shareholder agreement to be subject to the option. We agree with both and therefore affirm.

### 1. Jarvis's option was conditioned on the acquisition of Johnson Trust shares by Motors.

■■■ "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." [12] We have embraced "the well-settled rule of contract interpretation that conditions are disfavored and will not be found in the absence of unambiguous language indicating the inten-

tion..to create a conditional obligation." [13] To be enforceable, a condition must be "expressed in plain, unambiguous language or arise by clear implication." [14] This interpretive rule "protects both parties to the transaction and also does not involve the consequences that a slight failure to perform wholly destroys all rights under the contract." [15]

■ We conclude that Jarvis's employment contract conditioned his purchase option on the future sale of Johnson Trust shares to Motors, for the language of the contract clearly indicates that the parties intended to create a condition.

Two provisions of the employment contract suggest that Jarvis's option was conditioned on a future purchase of Johnson Trust shares by Motors. The first addresses when Jarvis's option could be exercised:

> The performance option stock transfer will be exercised *after* the purchase from Jim Johnson Trust Account by Gary Ensminger/Fairbanks Nissan' or December 31, 2000, whichever is later.

---

10. *Id.*

11. The superior court addressed the existence of the condition only in its October 29, 2003 order. However, the court's conclusion that the parties intended to include a condition precedent to the option in the contract is essential to the court's determination that the parties did not intend for Ensminger's shares to be subject to the option.

12. RESTATEMENT (SECOND) OF CONTRACTS § 224 (1981).

13. *Logghe v. Jasmer*, 686 P.2d 694, 698 (Alaska 1984); *see also Peterson v. Wirum*, 625 P.2d 866, 873 n. 14 (Alaska 1981) (holding that contract language purporting to condition repayment of partner loans on receipt of financing from specific bank was not sufficiently unambiguous to constitute condition precedent); Catherine M.A. McCauliff, CORBIN ON CONTRACTS § 30.14, pp. 29–30 (Rev. Ed.1999) ("If the non-occurrence of a condition causes a forfeiture, the law will try to reduce the risk of forfeiture within the limits allowed by the competing policy of freedom of contract."); RESTATEMENT (SECOND) OF CONTRACTS § 227 (1981) ("In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obli-

gee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.").

14. *Prichard v. Clay*, 780 P.2d 359, 362 (Alaska 1989) (quoting *Wirum*, 625 P.2d at 873); *see also Norton v. Herron*, 677 P.2d 877, 882 (Alaska 1984) (clause in agreement to purchase real property in Fairbanks calling for purchaser to use funds from sale of own property in Montana for monthly payments on Fairbanks property not condition precedent permitting vendor to void purchase agreement simply because purchaser used other source for payments where vendor completely failed to inquire as to equity in purchaser's Montana property).

15. *Norton*, 677 P.2d at 882 (quoting *Wirum*, 625 P.2d at 873 n. 14). The Restatement of Contracts articulates a similar justification for this rule, observing that since the "non-occurrence of a condition of an obligor's duty may cause the obligee to lose his right to the agreed exchange after he has relied substantially on the expectation of that exchange ... [,][w]hen ... it is doubtful whether or not the agreement makes an event a condition of an obligor's duty, an interpretation is preferred that will reduce the risk of forfeiture." RESTATEMENT (SECOND) OF CONTRACTS, § 227 cmt. b.

(Emphasis added.) The second discusses an event that must occur before Jarvis might exercise his option:

> The percentage that is being made available are Jim Johnson Trust Shares which must first be bought from Jim Johnson by Gary Ensminger/Fairbanks Nissan.

Under these provisions, Jarvis could not exercise his option until after Motors acquired the Johnson Trust shares. Thus, whether this language creates a condition depends on the certainty of that sale.[16] If the parties reasonably expected that the sale was a certainty, this language would not create a condition; instead, it would specify the mechanics of Jarvis's option. Based on the interaction of Jarvis's employment contract with the July 15, 1997 shareholder agreement, we conclude that the parties could not have reasonably believed that the future sale was certain to occur.[17]

As discussed above, the shareholder agreement specified three ways that Motors might acquire the Johnson Trust shares: (1) Motors could exercise a call option on the Johnson Trust shares at any time following Johnson's seventieth birthday, (2) Johnson could exercise a put option at any time following his seventieth birthday, and (3) Motors could fulfill its obligation to purchase the Johnson Trust shares in the event of Johnson's death.[18]

Whether the call or put option would be exercised was uncertain; neither Motors nor Johnson was obliged to exercise them.

Moreover, the employment contract specified that Jarvis's option would ripen after the purchase of Johnson Trust shares or December 31, 2000, whichever is later. This alternate timing would be superfluous if the parties had expected that Motors would purchase the Johnson shares as soon as the call or put option ripened, or at some other relevant time (such as when Motors had sufficient cash or received financing to purchase the shares). And while Johnson's death itself is a certainty, the timing of his death is sufficiently unknown as to preclude the parties from reasonably considering it a certain event for purposes of this contract.

But while the contract does not use magic words like "conditioned" or "contingent," the most natural reading of the contract includes a condition. Considering the evidence as a whole, a "clear implication" arises that a condition was intended by the parties.[19] Indeed, the disputed language makes little sense as anything but a condition.

Based on the foregoing, we conclude that the parties intended for Jarvis's option to be conditioned on the future purchase of the Johnson Trust shares by Motors.

### 2. The parties did not intend for Ensminger's shares to be subject to the option.

The superior court also concluded that the parties did not intend for the issuance of 7,500 shares to Ensminger to trigger Jarvis's option.[20] The basis for the court's second

**16.** *See* RESTATEMENT (SECOND) OF CONTRACTS § 224 & cmt. b (1981) ("there is inherent in the concept of condition some degree of uncertainty as to the occurrence of the event.... [T]he mere passage of time, as to which there is no uncertainty, is not a condition and a duty is unconditional if nothing but the passage of time is necessary to give rise to a duty of performance.").

**17.** Jarvis's employment contract states that "[a]ll parties have read and understand the shareholder agreement dated July 15, 1997." Thus the provisions of the shareholder agreement are relevant to understanding the parties' expectations. Additionally, Jarvis presented evidence to the superior court regarding his reasonable expectations; he swore in an affidavit that Ensminger led him to believe that "by virtue of his own employment agreement he was entitled to, or in the process of, receiving additional shares which could make him a 100% owner." No such "em-

ployment agreement" appears in the record. Jarvis does not contend here, nor did he below, that the superior court did not allow him to discover such a document.

**18.** Indeed, given the absence of any reference to Johnson's age in the record, it may well be that Johnson would have reached his seventieth birthday while still exercising corporate control under the shareholder agreement; thus, Johnson would have the authority to decide whether either option would be exercised.

**19.** *Prichard v. Clay,* 780 P.2d 359, 362 (Alaska 1989).

**20.** The court noted in its October 29, 2003 ruling that it could rule on the condition precedent as a matter of law. The court then observed that a possible factual dispute existed as to whether the

conclusion is two-fold: (1) the words of the contract unambiguously indicate that the parties intended only for shares owned by the Johnson Trust as of February 1, 1998 to be subject to the option; and (2) it is undisputed that Ensminger obtained his shares on August 26, 1997.

In his brief, Jarvis disputes the finding that the parties intended only for shares that had not yet been purchased from the Johnson Trust to be subject to his option. He contends that the parties understood that Ensminger's shares "were subject to the Jarvis purchase option." As evidence for this claim, Jarvis points to his November 26, 2003 affidavit. The affidavit expresses Jarvis's belief that, as of February 1, 1998, the parties understood that Ensminger's "shares were subject to my option to purchase agreement."

Motors replies that this interpretation ignores the plain meaning of the contract and gives too much weight to Jarvis's subjective understanding of the contract. The defendants also point to the words of the February 1, 1998 employment contract which indicate that the shares subject to Jarvis's option were to be purchased from the Johnson Trust at a future time. We agree with the defendants for three reasons.

■ First, Jarvis's interpretation of the contract conflicts with language in the contract indicating that the shares which would be made available to him had not yet been purchased from the Johnson Trust. The contract states, in relevant part:

> The performance stock option transfer will be exercised *after* the purchase from Jim Johnson Trust Account ... or December 31, 2000, whichever is [later].
>
> . . . .
>
> The percentage that is being made available are Jim Johnson Trust shares *which must first be bought* from Jim Johnson by Gary Ensminger/Fairbanks Nissan.

(Emphasis added.) This language clearly indicates that the parties intended that Jarvis's option would allow him to purchase shares that had not yet been purchased from the Johnson Trust. Jarvis does not dispute that he was aware that Ensminger had received his shares prior to the negotiation of the employment contract.[21] Moreover, "[i]n reaching a reasonable interpretation of a contract, we attempt to give effect to all of its terms." [22] Jarvis's interpretation would render the timing provision superfluous since a timing provision would be pointless if the option had already ripened.

Second, the parties could not have reasonably considered Ensminger's shares to have been Johnson Trust shares.[23] According to the employment contract, "[t]he percentage that is being made available are *Jim Johnson trust shares* which must first be bought from Jim Johnson by Gary Ensminger/Fairbanks Nissan." (Emphasis added.) The contract further states that "[a]ll parties have read and understand the shareholder agreement dated July [10], 1997." A review of the July 10, 1997 shareholder agreement indicates that Ensminger's shares were new shares issued by Motors and were not purchased from the Johnson Trust.

---

parties intended that Ensminger's shares be subject to the option. The court's December 31, 2003 ruling similarly held that summary judgment would be premature without evidence of when Ensminger acquired his shares. After Motors presented evidence that Ensminger had obtained his shares on August 26, 1997, the court granted summary judgment. Presumably, the court concluded that the parties intended for only shares purchased from the Johnson Trust by Gary Ensminger/Fairbanks Nissan after the execution of the employment agreement to be available to Jarvis, and that Ensminger's shares had been purchased from the Johnson Trust at some point. Under this theory, the only question left was whether Ensminger bought his shares during the relevant time frame. Once the court was

convinced that Ensminger had acquired his shares prior to February 1, 1998, the court concluded that the condition had not been satisfied and Jarvis could not prevail.

**21.** *See* Complaint 2.

**22.** *Matanuska Electric Ass'n, Inc. v. Chugach Electric Ass'n, Inc.,* 99 P.3d 553, 562 (Alaska 2004) (citations omitted).

**23.** Although this issue was not discussed by the superior court or raised by the parties, we may affirm a lower court's decision on any grounds supported by the record. *Marshall v. First Nat'l Bank of Alaska,* 97 P.3d 830, 835 (Alaska 2004).

The shareholder agreement described Ensminger as "a prospective shareholder of Motors, Inc. pending issuance of 7500 shares of Motors, Inc. stock to him *by Motors, Inc.*" (Emphasis added.) The shareholder agreement also described the Johnson Trust as a "present shareholder of Motors, Inc .... holding 7,500 shares of its common stock." Taken together, these recitals indicate: (1) that Ensminger received his 7,500 shares from Motors, rather than the Johnson Trust; and (2) that the Johnson Trust could not have sold Ensminger 7,500 shares because such a sale would have exhausted its holdings. In light of these facts, the parties could not have reasonably considered Ensminger's shares to have been shares that had been purchased from the Johnson Trust.

■ Lastly, Jarvis's evidence that the parties understood that Ensminger's shares would be subject to the option was not sufficient to avoid summary judgment. A party moving for summary judgment bears the initial burden of showing the absence of an issue of material fact and that it is entitled to judgment as a matter of law.[24] Once the movant has met this dual burden, the burden shifts to the non-movant to produce facts showing that he will be able to present admissible evidence tending to dispute or contradict the movant's evidence.[25] After Motors supported its motion for summary judgment with the text of the employment agreement, the shareholder agreement, and a copy of the August 26, 1997 stock certificate, the burden shifted to Jarvis to present contradictory evidence. Jarvis's evidence consisted only of his own conclusory affidavit. He stated:

At the time I entered into the employment agreement with the defendants, I believed, based upon representations made to me by Gary Ensminger, that he was a 50% owner of Motors, Inc. I understood that he received the shares that made him a 50% owner from Jim Johnson. *These shares were subject to my option to purchase agreement.*

(Emphasis added.) This statement is not sufficient to demonstrate a factual dispute over the meaning of the contract. "[P]arties' testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions."[26] We generally ignore such statements in favor of "express manifestations of each party's understanding of the contract in attempting to give effect to the intent behind the agreement."[27] In this case, Jarvis has not put forward any other evidence to support his interpretation.

We thus affirm the superior court's conclusion that the parties did not consider Ensminger's 7,500 shares to be subject to the option.

## B. It Was Error To Dismiss Jarvis's Claims for Misrepresentation and Promissory Estoppel.

The superior court dismissed Jarvis's claims for misrepresentation and promissory estoppel even though Motors did not move for summary judgment regarding these claims.[28] The superior court did not explain this decision. Jarvis contends that this was erroneous, arguing that it was improper to grant summary judgment because Motors did not present evidence showing that there were no issues of material fact and because he had no opportunity to present contradictory evidence. Motors asserts that summary judgment would have been appropriate in regard to the misrepresentation claim because the alleged misrepresentations were, in fact, true. Motors also maintains that Jar-

24. *Shade v. CO & Anglo Alaska Service Corp.*, 901 P.2d 434, 437 (Alaska 1995).

25. *Id.*

26. *Sprucewood Invest. Corp. v. Alaska Housing Corp.*, 33 P.3d 1156, 1162 (Alaska 2001).

27. *Id.* (quoting *Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981)).

28. Defendants did not address these claims in any of their summary judgment motions. *See* Memorandum in Support of Motion for Summary Judgment; Reply to Opposition to Motion for Summary Judgment; Memorandum in Support of Reconsideration; Reply to Supplemental Opposition to Motion for Summary Judgment; Renewed Motion for Summary Judgment; Reply to Opposition to Renewed Motion for Summary Judgment. The superior court stated that these issues were not briefed.

vis's misrepresentation and promissory estoppel claims merely restated his contract claims and were, therefore, properly dismissed.

 We agree with Jarvis that it was error to grant summary judgment in regard to his misrepresentation and promissory estoppel claims. On summary judgment, it is the "moving party that bears the initial burden of proving, through admissible evidence, the absence of genuine factual disputes and its entitlement to judgment." [29] The non-movant is not obligated to make any factual showing "until the moving party makes a prima facie showing of its entitlement to judgment on established facts." [30] Motors never moved for summary judgment regarding Jarvis's claims for misrepresentation or promissory estoppel or presented evidence showing the absence of any genuine issues of material fact. The burden of showing any genuine issues of material fact, therefore, never shifted to Jarvis and his claims should not have been dismissed for failure to carry this burden.[31]

We consider in turn whether the erroneous grant of summary judgment regarding Jarvis's misrepresentation and promissory estoppel claims was harmless.

### 1. Summary judgment regarding the misrepresentation claim was not harmless.

Motors contends that any procedural error in dismissing Jarvis's misrepresentation claim was harmless because Motors was entitled to summary judgment. Motors claims that the relevant representations that form the basis of Jarvis's tort claim were shown to be true and that Jarvis's tort claims merely restate his breach of contract claim. We disagree.

### a. Ensminger's alleged misrepresentations were not shown to be true.

Jarvis's complaint maintains that "Ensminger misrepresented basic terms of the contract to induce Jarvis to sign the agreement." Jarvis has claimed that Ensminger made three misrepresentations: (1) that Ensminger had a right to acquire the remaining 7,500 shares in the Johnson Trust, (2) that Ensminger was involved in the process of acquiring them, and (3) that Ensminger's shares were subject to Jarvis's option. Based on the record, we cannot conclude that Ensminger's alleged false statements were proven true.

Jarvis swore:

> I also believed, based upon Ensminger's representations, that by virtue of his own employment agreement he was entitled to, or in the process of, receiving additional shares which would make him a 100% owner.

We are unable to conclude that these alleged representations were shown to be true, because we cannot review their truth. The record does not contain Ensminger's employment contract. We are confident that such a document exists because of multiple references to it in the shareholder agreement and the November 27, 1998 amendment to the shareholder agreement. Its absence from the record, however, precludes us from agreeing that any representation regarding its contents was, as Ensminger argues, "proven undisputably true."

Jarvis also swore that:

> At the time I entered into the employment agreement with Motors, I believed, based upon representations to me by Gary Ensminger, that he was a 50% owner of Motors, Inc. I understood that he received the shares that made him a 50% owner from Jim Johnson. *These shares were subject to my option to purchase agreement.*

(Emphasis added.) Motors is correct that Ensminger's alleged representation that he was a fifty percent owner is true, but Jarvis never asserted the falsity of this statement.[32] Jarvis does assert, however, that Ensminger

---

**29.** *Shade,* 901 P.2d at 437 (citations omitted).

**30.** *Id.* (citations omitted).

**31.** We do not consider whether a genuine issue of material fact exists regarding Ensminger's alleged misrepresentations.

**32.** *See* Complaint 2.

represented that his shares were subject to Jarvis's option. The grant of summary judgment was inconsistent with that claim. Moreover, it cannot be said that Ensminger's alleged misrepresentations were "shown to be true."

### b. Jarvis asserted a breach of an independent duty.

Motors also maintains that Jarvis's misrepresentation claim was properly dismissed because it merely "repeat[ed] his claim that the contract means something other than what is written." We disagree.

▆▆▆ We have recognized that "[p]romises set forth in a contract must be enforced by an action on that contract. Only where the duty breached is one imposed by law, such as a traditional tort law duty furthering social policy, may an action between contracting parties sound in tort."[33] As the New York Court of Appeals recognized in *NYU v. Continental Insurance Co., Inc.:*[34]

A tort obligation is a duty imposed by law to avoid causing injury to others. It is "apart from and independent of promises made and therefore apart from the manifested intention of the parties." Thus, [a] defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations.[35]

Thus a violation of a duty arising from contract—such as the duty to pay wages under an employment contract or tender payment for goods—does not give rise to a tort claim. However, when a party's actions violate a general duty of care, its actions may give rise to an action in tort, even if the violation also breaches a contract.[36]

▆▆▆ Alaska law imposes an independent duty to refrain from the tort of intentional misrepresentation. The essential elements of that tort are: (1) a false representation of fact, (2) knowledge of the falsity of the representation, (3) intention to induce reliance, (4) justifiable reliance, and (5) damages.[37] Jarvis has asserted that Ensminger violated his duty to avoid such conduct.[38] We therefore conclude that Jarvis's claim for misrepresentation alleges a breach of a duty independent of the contract.

### 2. Dismissal of Jarvis's promissory estoppel claim is not conclusively harmless.

The superior court also dismissed Jarvis's promissory estoppel claim without a motion for dismissal or summary judgment. Motors again contends that any procedural error was harmless, here because the "alleged ... promissory estoppel representations are subsumed by the written contract."

▆▆▆ Promissory estoppel is an equitable doctrine that allows the enforcement of a promise made unenforceable by technical defects or defenses.[39] The Restatement (Second) of Contracts sets out the doctrine:

---

**33.** *Alaska Pacific Assur. Co. v. Collins*, 794 P.2d 936, 946 (Alaska 1990) (citing *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, 1334 (1980)); *see also ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1154 (Alaska 1988) (Alaska law does not allow tort recovery for breach of covenant of good faith and fair dealing implied in all employment contracts unless breach rises to level of traditionally recognized tort, such as infliction of emotional distress).

**34.** 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995).

**35.** *Id.* at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (citation omitted).

**36.** *See* RESTATEMENT (SECOND) OF TORTS § 549(2) (1977).

**37.** *City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1176 n. 4 (Alaska 1998) (citations omitted).

**38.** He claims that Ensminger knowingly misrepresented his rights and his plans to purchase the Johnson Trust shares and thereby induced Jarvis to rewrite his employment contract and accept deferred compensation in the form of the purchase option. We do not reach any conclusion on the merits of Jarvis's misrepresentation claim. We only hold that it alleges a breach of a tort duty.

**39.** *Brady v. State*, 965 P.2d 1, 10 (Alaska 1998); *see also* Eric Mills Holmes, *Restatement of Promissory Estoppel*, 32 WILLAMETTE L.REV. 263, 271–86 (1996).

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.[40]

A claim for promissory estoppel requires that "an actual promise was made and itself induced the action or forbearance in reliance thereon." [41] But such a claim is "a theory, independent of contract, for awarding reliance damages." [42] And when a defect in contract formation or validation—for example, failure of a condition—prevents action on the contract, courts recognizing promissory estoppel "perceive the correlative rights and duties as distinct from contract." [43]

We have concluded that the superior court properly granted summary judgment to Motors because of the failure of a condition of the contract.[44] But this determination does not require the conclusion that Jarvis could not establish the existence of promissory estoppel. That a requirement for enforcement of a contract is lacking, denying a legal remedy, does not mandate denial of the equitable remedy here. Especially in light of the complete failure on the part of Motors to even request summary judgment (or dismissal) of the promissory estoppel claim, we cannot say that the grant of summary judgment as to this claim was conclusively harmless.

## V. CONCLUSION

Because a future sale of the Johnson Trust shares to Motors was a condition precedent to Jarvis's stock purchase option, and this sale never occurred, Jarvis's option never ripened. We therefore AFFIRM the superior court's grant of summary judgment in regard to Jarvis's contract claims. Because there was no motion for summary judgment

regarding Jarvis's claims for misrepresentation and promissory estoppel, we conclude that it was error to grant summary judgment on these issues. This error was not harmless in regard to Jarvis's misrepresentation claims and we cannot say that it was harmless as to his promissory estoppel claim. We therefore REVERSE the grant of summary judgment on Jarvis's misrepresentation and promissory estoppel claims and REMAND those claims to the superior court for further proceedings consistent with this opinion.

---

**40.** Restatement (Second) of Contracts § 90(1) (1981).

**41.** *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.,* 45 P.3d 657, 668 (Alaska 2002). We have adopted a four-part test for claims of promissory estoppel. *See id.* ("(1) The action induced amounts to a substantial change of position; (2) it was either actually foreseen or reasonably foreseeable by the promisor; (3) an actual promise was made and itself induced the action or forbearance in reliance thereon; and (4) enforcement is necessary in the interest of justice.") (citing *Zeman v. Lufthansa German Airlines,* 699 P.2d 1274, 1284 (Alaska 1985)).

**42.** Holmes, *supra* n. 39 at 289.

**43.** *Id.*

**44.** *See supra* Part IV.A.